970 A.2d 968

**Omar PARKER**

v.

**STATE of Maryland.**

**No. 1469, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

May 7, 2009.

400

402

Deborah S. Richardson (Nancy S. Forster, Public Defender, on the brief), Baltimore, for Appellant.

Robert Taylor, Jr. (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: DAVIS, HOLLANDER and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

In an incident that occurred on November 29, 2005, Omar Parker, appellant,[1] threatened Kya Hicks with a gun. Appel-

---

1. The prosecutor and appellant's attorney informed the court at sentencing that appellant's actual name is Omar Anderson.

lant was arrested on February 17, 2006, with respect to that incident. Following a trial in May 2007, a jury in the Circuit Court for Baltimore City convicted Parker of second-degree assault, in violation of Md.Code (2002 Repl.Vol., 2005 Supp.), § 3–203 of the Criminal Law Article ("C.L."), and retaliation for testimony, in violation of C.L. § 9–303.[2] The court sentenced appellant to five years' incarceration for second-degree assault and, pursuant to C.L. § 9–303(c)(2), to a concurrent term of twenty years for retaliation.

This appeal followed. Appellant presents three questions for our review. Recasted and reordered, they are:

1. Did the trial court err by imposing a sentence of twenty years for the crime of retaliation?

2. Did the trial court err or abuse its discretion in limiting cross-examination of the State's key witness?

3. Did the trial court err or abuse its discretion in declining to allow character evidence from a witness who was not in attendance?

4. If preserved, did the trial court err in admitting prejudicial testimony that the victim was placed in witness protection?

For the reasons set forth below, we shall affirm appellant's convictions but vacate his sentence for retaliation and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

At trial, the State moved *in limine* to exclude evidence of a fire in Hicks's apartment that occurred in May 2005, which resulted in Hicks's temporary loss of custody of her children. The State also sought to exclude evidence of various complaints that Hicks made to the police "against numerous different people," which did not result in charges against them. The court granted the State's motions, but ruled that

---

**2.** Appellant was acquitted of first-degree assault; use of a handgun in the commission of a felony or crime of violence; and wearing, carrying, or transporting a handgun.

appellant could "ask Hicks if the reason she's telling this situation is because she blames [appellant] for her children being taken away from her without allusion to the fire."

Hicks testified that she lived in an apartment on Lennox Street in Baltimore City, located in a neighborhood that "was really drug infested." She elaborated: "Meaning that drug dealers would stand in front of my doorway, in front of my kids [' ] window, outside preying, selling drugs in front of our kids." Hicks explained that she thought they were drug dealers because she saw "them serve a couple people .... giving things in little baggy's [sic] or clear bottles, little tiny bottles," and she believed the "things" to be drugs. She added that the drug dealing occurred "[r]ight by [her] doorway," inside the apartment building.

Hicks recounted that between 11 p.m. and midnight on May 23, 2005, she awoke to the sound of a gunshot "coming through [her] son's bedroom window." She "seen a hole through the window and [she] looked over to the wall and [she] seen the hole through the wall." Hicks called 911. The State entered photographs of the room and the window into evidence. When the prosecution asked Hicks how she "handl[ed] the drug dealers" before the May 2005 incident, she replied that she was "[r]eporting them to the police and the rental office." She recalled that the police would respond in a marked patrol car and, "[o]nce the police got there, [the drug dealers] would run."

With respect to the events of November 29, 2005, Hicks stated: "I was coming home from a class I had which got out at twelve o'clock,[3] so I got home like twelve thirty ... and seen about thirty junkies in front of my door." She asked the people "to move" so that she could get into her apartment. She identified appellant as one of the persons who was standing by her steps. According to Hicks, she had seen Parker outside her apartment previously, "selling to junkies" and

---

3. The transcript does not indicate whether it was midnight or noon.

"[g]iving out testers ... samples of the ... drug product."
The following colloquy is pertinent:

> [PROSECUTOR]: ... Now going back to November twen-
> ty-ninth of 2005, you saw Mr. Parker and thirty junkies in
> front of your door. What did you do?
>
> [HICKS]: When I asked them to move he said, "Bitch wait,
> don't rush me. I'll move when I'm finished." I stated wait
> right there, I have something for you. He said, "You go
> into the house and call the police, I'll shoot through your
> window like I done the first time."
>
> [PROSECUTOR]: What did you believe he meant by that?
>
> [HICKS]: Meaning he was the one who shot through my
> window [in May of 2005].
>
> [PROSECUTOR]: Okay, did Mr. Parker display anything
> when he said this?
>
> [HICKS]: Yes, a gun.
>
> [PROSECUTOR]: Okay. And how did he display it?
>
> [HICKS]: He opened up his coat and I seen a gun in his
> waistband.

Hicks described the weapon as a "little gun" with a silver
handle, sticking out of the waistband of appellant's pants.
When she saw it, Hicks "ran into the house and called the
police." Hicks claimed that she was "[s]cared of my life ....
[b]ecause he was a drug dealer and he said he was going to
shoot through my window again."

> On cross-examination, the following ensued:
>
> [APPELLANT'S COUNSEL]: Now Mam, you stated on
> direct examination that there was an argument with my
> client, is that right?
>
> [HICKS]: Yes.
>
> [APPELLANT'S COUNSEL]: And I believe the words
> that you used was um you stated he said I have something
> for you, is that right?
>
> [HICKS]: No. I stated I had something to say. Meaning I
> was going to call the police because I was known for around
> here to call the police.

[APPELLANT'S COUNSEL]: But you said you had never actually talked to anybody in the community or any drug dealers.

[HICKS]: Talk you mean conversation. I was in an argument and I don't consider that talking.

Baltimore City Police Officer Karl D. Hayes responded to Hicks's 911 call in May 2005. He stated that the bullet came in through the window and "lodged in the wall." But, he did not arrest anyone for the incident, because "[n]o one was at the scene and no one actually visually saw anyone commit this offense."

At the close of the State's case, defense counsel moved for acquittal. With regard to the gun charges, defense counsel argued that "no gun was found." With respect to the assault charges, he asserted that there was "no description of shooting any specific person" and "no actual threat to an individual." As to the retaliation charge, the following ensued:

[APPELLANT'S COUNSEL]: [Hicks] never testified that she actually spoke with anybody in the community about anything about calling the police. There's no testimony that the police were ever called on several occasions besides hers. There's no actual documentation of any of it.... [N]obody knew that [she called the police multiple times]. People have to know to retaliate to something and there was no testimony.

\* \* \*

[PROSECUTOR] ... [Appellant's] own words indicate that he knew that she was calling the police.

The court denied the motion.

Appellant testified that Hicks "live in the neighborhood" and he first had contact with her when he "saved her kids" in May 2005.[4] He denied that he had any contact with Hicks after that time.

---

4. The court directed defense counsel to the "next question," and did not permit testimony about how appellant "saved her kids."

■■■■■■■■■■■■

The prosecutor showed appellant Detective Schuler's notes from an oral statement that appellant gave the police on February 16, 2006, attached to a sheet that Parker signed under the statement: "I am willing to answer questions, and I do not want any attorney at this time. My decision to answer questions without having an attorney present is free and voluntary on my part."[5] Appellant agreed that he had signed the statement. The following colloquy is pertinent:

[PROSECUTOR]: All right, and there was a question at the end of that [conversation]. Did you know about her windows being shot out? And your response was "I heard about it but I didn't do shit."

[APPELLANT]: I never said that.

[PROSECUTOR]: Do you remember the detectives asking you about it?

[APPELLANT]: Yea I tell them that I don't know nothing about nothing. That's what I told them.

Appellant denied that he showed Hicks a gun on November 29, 2005. Indeed, appellant maintained that he did not know Hicks's name and had never talked to her. The following exchange is pertinent:

[PROSECUTOR]: You knew the people in the neighborhood didn't like her?

[APPELLANT]: I mean she didn't like people in the neighborhood. She'd chase people. . . .

\* \* \*

[PROSECUTOR]: You knew people in the neighborhood didn't like her, correct?

\* \* \*

[APPELLANT]: No I don't [know] that people didn't like her.

---

5. The State did not use appellant's statement in its case in chief.

[PROSECUTOR]: You knew her window was shot out, right?

[APPELLANT]: No, I didn't.

\* \* \*

She beefs [6] with people. She's the one with, that chased people around like I said.

Appellant admitted that he pleaded guilty to drug distribution in 2004 and possession with intent to distribute in 2006, because he "was guilty."

The defense rested and renewed its motion for acquittal, incorporating its prior arguments. The court again denied the motion.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant challenges his sentence for retaliation under C.L. § 9–303, claiming the court improperly imposed an enhanced sentence because a jury should have determined the underlying factual issues. C.L. § 9–303 provides, in part:

**§ 9–303. Retaliation for testimony.**

(a) *Prohibited.*—A person may not intentionally harm another, threaten to harm another, or damage or destroy property with the intent of retaliating against a victim or witness for:

(1) giving testimony in an official proceeding; or

(2) reporting a crime or delinquent act.

\* \* \*

(c) *Penalty.*—(1) Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty

---

6. Appellant explained to the court that "beefing" is "[a]rguing with guys ... going back and forth with guys...."

of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both.

(2) If the official proceeding or report described in subsection (a) of this section relates to a felonious violation of Title 5 of this article [7] or the commission of a crime of violence as defined in § 14–101 of this article, or a conspiracy or solicitation to commit such a crime, a person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 20 years.

We pause to review relevant facts.

Appellant was charged, *inter alia,* with witness retaliation. The Statement of Charges, dated February 15, 2006, stated that appellant "did intentionally harm/damage or destroy property with the intent of retaliating against Kya Hicks[,] a victim or witness[,] for giving testimony in an official proceeding/reporting a crime or delinquent act," in violation of C.L. § 9–303.[8] The Statement of Charges also indicated that the penalty for violation of. the statute was a maximum of five years' imprisonment and/or a $5,000 fine.

The State filed a "Criminal Information" on April 11, 2006. Under the heading "Intimidate/Influence a Witness," it averred that appellant

did by *THREAT,* try to *INFLUENCE and INTIMIDATE* **Keya [sic] Hicks,** a *VICTIM and WITNESS,* for reporting Drug Activity that is a felony in violation of Title 5 of Criminal Law Article Section 9–303(a)(2) of the Annotated Code of Maryland; against the peace, government and dignity of the State.

[CR 9–303(a)(2) ] [9](9–303(c)(2)[) ].

---

7. Title 5 of the Criminal Law Article is labeled "Controlled Dangerous Substances, Prescriptions, and Other Substances."

8. The Statement of Charges did not specify a subsection of the statute.

9. These brackets surrounding CR 9–303(a)(2) appear in the Criminal Information.

At the conclusion of the evidence, the court instructed the jury, in part:

Lastly, the defendant is charged with retaliation of testimony. In order to convict the defendant with retaliation of testimony, the State must prove; (1) that the defendant intentionally harmed another or threatened to harm another, or damaged or destroyed property and; (2) that the defendant did so with the intent of retaliating against the victim or witness because the victim or witness either gave evidence in an official proceeding or reported a crime or delinquent act.

Appellant did not object to the jury instruction.

At sentencing, the State claimed that appellant "was charged under the felony retaliation for testimony" and faced a maximum penalty of twenty years in prison. The defense claimed that the maximum sentence was five years. Noting that appellant "was charged under C2 not C1," the court stated that "the penalty that exists under the charge of retaliation, as charged in this particular case, the maximum sentence is twenty years." It said: "I'm going to sentence him [under] the felony retaliation statute. If you have an objection you should now make that objection." Appellant's counsel replied: "No, no, your Honor." Thereafter, the court sentenced appellant to five years of incarceration for second-degree assault, and to a concurrent term of twenty years for retaliation.

As noted, appellant contends that "the trial court erred in sentencing appellant pursuant to a sentencing enhancement that was not submitted to or passed upon by the jury." He argues:

Having been convicted of the crime, subsection (c)(1) provides a maximum sentence of five years. Subsection (c)(2) contains a sentencing enhancement providing that if the underlying statutory violation "relates to a felonious violation of Title 5 of this article or the commission of a crime of violence as defined in § 14–101 of this article, or a conspiracy or solicitation to commit such a crime," the maximum

sentence is 20 years. Appellant was sentenced to 20 years incarceration. The jury was never instructed that it had to find the sentencing enhancement applicable beyond a reasonable doubt and sentencing Appellant to 20 years incarceration violates Maryland common law as well as Maryland and Federal due process principles.

Quoting *Wadlow v. State,* 335 Md. 122, 129, 642 A.2d 213 (1994), discussed *infra,* appellant asserts:

" '[W]here the legislature has prescribed different sentences for the same offense, depending upon a particular circumstance of the offense, [the courts] have held that the presence of that circumstance must be alleged in the charging document, and must be determined by the trier of fact applying the reasonable doubt standard.' "

In appellant's view, the court erred by failing to instruct the jury as to its duty to determine "the facts necessary to establish the sentencing enhancement," as required by Maryland common law.

Appellant also contends that the enhancement of his sentence "violates due process principles" under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and its progeny. In his view, "the trial court did not have in its arsenal the option of the twenty year sentencing enhancement," because the court did not instruct the jury to determine whether "the sentencing enhancement contained in [§ 9–303](c)(2) existed beyond a reasonable doubt."

In addition, appellant contends that "the trial court failed to instruct the jury on every element of the crime charged." In particular, he claims that the court "did not instruct the jury that it must find that 'the official proceeding or report [that was the subject of retaliation] relates to a felonious violation of Title 5 ... or the commission of a crime of violence as defined in § 14–101 ... or a conspiracy or solicitation to commit such a crime.' " He posits: "By failing to instruct the jury on each and every element of the crime with which he was charged, and ultimately sentenced under, the court violated Appellant's due process right that the State 'prove every ingredient of an

offense beyond a reasonable doubt.' " (Citation omitted.) Parker adds: "The trial court did not instruct the jury on an essential element of the crime, i.e. the facts that had to be established to invoke the 20 year sentencing enhancement. The omission of this essential element constituted reversible plain error."

The State responds that "it is unclear that the Legislature created two separate offenses when it imposed a harsher penalty for witness retaliation arising out of drug felonies and crimes of violence." It posits:

> In the instant case, the State was not obligated to prove that Parker was aware that Hicks had made reports of drug felonies, as such; only that he was retaliating for the reports that Hicks had made. That the specific crimes she reported (drug trafficking . . .) were felonies under Title 5 of the Criminal Law Article could be determined under Maryland law by the sentencing judge.

Further, the State claims: "Parker was specifically charged with retaliating against a witness to a drug felony . . . and sufficient evidence was presented to a jury to allow it to determine that it was Hicks's reports of drug felonies that led to the threats and intimidation against her." Moreover, it points out that "there was no claim that Parker was motivated by anything other than Hicks's police complaints regarding drug felonies[.]" Instead, asserts the State, appellant's defense focused on agency. Alternatively, the State maintains that, "even if the nature of the crime reported is an element of the crime of retaliation," appellant's jury instruction argument is unpreserved, because "Parker did not seek a specific instruction on that point, nor did he object to its absence."

As to the *Apprendi* claim, the State points out that "Parker did not contest the State's evidence as to why Hicks was the victim of retaliation." It reiterates that his "defense was that [Hicks] incorrectly identified him as the person who attempted to retaliate against her." While distinguishing the facts of *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, in which the defendant did not deny criminal agency, the State "recognizes that, as in *Apprendi*, the instant case allows for an increased sentence to

be imposed based upon the specific motivation of the defendant who committed the criminal act." Noting that Maryland courts have not yet considered whether *Apprendi* applies to C.L. § 9–303, it concedes: "If this Court were to find that *Apprendi* applied, the matter should be remanded for resentencing under § 9–303(c)(1)." [10]

As we have seen, the court sentenced Parker under "the felony retaliation statute" after generally instructing the jury on the crime of retaliation, but without instructing the jury to determine whether Hicks's complaints related to drug activity, in violation of Title 5 of the Criminal Law Article. The question here is whether appellant was entitled to have a jury determine the applicability of the enhancement provision of C.L. § 9–303(c)(2), and, if so, whether the burden fell on the State to make that request. Put another way, we must first consider whether appellant's failure to raise the matter constituted a waiver of his complaint.

▇▇ Clearly, if appellant believed that he could be sentenced to enhancement based only upon a jury determination of the underlying elements, he would have no reason to ask for the jury to make that determination; the failure to have the jury do so would preclude imposition of an enhanced sentence.[11] Logic suggests that it was incumbent on the State, as the party seeking enhancement, to ask for a jury determination of the predicate facts. Therefore, we conclude that appellant did not waive his right to challenge imposition of the enhanced sentence merely because he did not ask the court to submit that issue to the jury.[12]

---

**10.** We note that the State did not advance a harmless error argument, and we have not considered that issue.

**11.** In this regard, the case *sub judice* is different from *Apprendi*, discussed *infra*, where the applicable statute made clear that the defendant could be subjected to an enhanced sentence based on the court's determination. 530 U.S. at 468–69, 120 S.Ct. 2348. Thus, the defendant had reason to challenge the constitutionality of the statute at sentencing. *Id.* at 471, 120 S.Ct. 2348.

**12.** If, indeed, appellant failed to preserve the issue by not requesting an appropriate jury instruction, or by failing to object to the jury instruc-

■■ Moreover, a trial court "may correct an illegal sentence at any time" under Md. Rule 4–345(a). As the Court said in *Walczak v. State*, 302 Md. 422, 427, 488 A.2d 949 (1985), "when the trial court has allegedly imposed a sentence not permitted by law, the issue should ordinarily be reviewed on direct appeal even if no objection was made in the trial court." *See Stubbs v. State*, 406 Md. 34, 48 n. 1, 956 A.2d 155 (2008); *Jones v. State*, 384 Md. 669, 678–79, 866 A.2d 151 (2005); *Fisher v. State*, 367 Md. 218, 293, 786 A.2d 706 (2001); *Moore v. State*, 163 Md.App. 305, 313–14, 878 A.2d 678 (2005). An illegal sentence includes a "sentence [that] is not a permitted one for the conviction upon which it was imposed and, [therefore], is intrinsically and substantively unlawful." *Chaney v. State*, 397 Md. 460, 466–67, 918 A.2d 506 (2007); *see Ingram v. State*, 179 Md.App. 485, 510, 947 A.2d 74 (2008) (same).

■ We conclude that the court erred in sentencing appellant to twenty years for retaliation, because the issue pertaining to sentencing enhancement was not submitted to the jury. We explain.

The framework for our review begins with *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348. It involved a challenge to New Jersey's "hate crime" law, which provided that, upon a defendant's conviction of an underlying crime, the defendant was eligible for "an 'extended term' of imprisonment if the trial judge [found], by a preponderance of the evidence, that '[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.' " *Id.* at 468–69, 120 S.Ct. 2348 (quoting statute). At sentencing, Apprendi unsuccessfully challenged the constitutionality of the statute. *Id.* at 471, 120 S.Ct. 2348.

---

tions, we would exercise our discretion to consider this important issue under the plain error doctrine. *See* Md. Rule 4–325(e); *State v. Hutchinson*, 287 Md. 198, 203, 411 A.2d 1035 (1980); *see Jones–Harris v. State*, 179 Md.App. 72, 96, 943 A.2d 1272, *cert. denied*, 405 Md. 64, 949 A.2d 652 (2008); *Morris v. State*, 153 Md.App. 480, 506–07 & n. 1, 837 A.2d 248 (2003), *cert. denied*, 380 Md. 618, 846 A.2d 402 (2004); *Danna v. State*, 91 Md.App. 443, 450, 605 A.2d 150, *cert. denied*, 327 Md. 627, 612 A.2d 257 (1992).

The Supreme Court subsequently invalidated the statute, *id.* at 491–92, 120 S.Ct. 2348, concluding that the Due Process Clause of the Fourteenth Amendment requires that, in state prosecutions, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. The Supreme Court observed, *id.* at 482–83, 120 S.Ct. 2348: ,

The historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties provided highlight the novelty of a legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.[ ]

In reaching its conclusion, the *Apprendi* Court differentiated between the terms "sentencing factor" and "element," *id.* at 494 n. 19, 120 S.Ct. 2348, remarking that in *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), it "coined the term 'sentencing factor' to refer to a fact that was not found by a jury but that could affect the sentence imposed by the judge." *Apprendi,* 530 U.S. at 485, 120 S.Ct. 2348. The *Apprendi* Court elaborated: "The term appropriately describes a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense." *Id.* at 494 n. 19, 120 S.Ct. 2348. In contrast, "facts that expose a defendant to a punishment greater than that otherwise legally prescribed were ... 'elements' of a separate legal offense." *Id.* at 483 n. 10, 120 S.Ct. 2348. The Court explained that, "when the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." *Id.* at 494 n. 19, 120 S.Ct. 2348. In distinguishing between a sentencing factor and

an element, the Court indicated that "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. 2348 (footnote omitted). *See also Ring v. Arizona,* 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) ("Because Arizona's enumerated aggravating factors [for imposition of the death penalty] operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury.") (Citation omitted); *Jones v. United States,* 526 U.S. 227, 252, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (construing carjacking statute to include three separate offenses, with "distinct elements, each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict").

In *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court reaffirmed *Apprendi.* These cases were discussed by the Court of Appeals in *Grandison v. State,* 390 Md. 412, 889 A.2d 366 (2005), *cert. denied,* 549 U.S. 956, 127 S.Ct. 382, 166 L.Ed.2d 275 (2006), in which the Court of Appeals said, *id.* at 442, 889 A.2d 366:

> Relying on the Court's holding in *Blakely,* the [*Booker*] Court explained that its "precedents ... make clear 'that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*' " [*Booker,* 543 U.S. at 232, 125 S.Ct. 738] (emphasis in original). Accordingly, the Court reaffirmed its holding in *Apprendi:* "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at [244, 125 S.Ct. 738].

*Fisher, supra,* 367 Md. 218, 786 A.2d 706, is also instructive. There, Mary Utley was charged and convicted of child abuse,

in violation of Art. 27, § 35(C). *Id.* at 226, 279, 786 A.2d 706. The child abuse resulted in the death of the child. *Id.* at 226, 786 A.2d 706. At that time, "§ 35C(b)(1) authorized a maximum sentence of fifteen years for child abuse and § 35C(b)(2) authorized a maximum sentence of twenty years if the abuse resulted in the death of the victim." *Id.* at 279–80, 786 A.2d 706. Utley, who was sentenced to twenty years, *id.* at 279, 786 A.2d 706, claimed on appeal that her sentence could not exceed fifteen years, because Count II of the indictment, pertaining to child abuse, did not allege that the abuse caused the victim's death. *Id.* at 280–81, 786 A.2d 706.

The Court of Appeals thought Utley's point was "well taken as a matter of Maryland criminal cause pleading," *id.* at 280, 786 A.2d 706, and thus it did not reach the due process issue under *Apprendi*. *Id.* at 282 n. 19, 786 A.2d 706. The Court recognized that the length of the sentence could be enhanced due to the presence of " 'a particular circumstance of the offense,' " i.e., that the child died as a result of the abuse, and therefore the charging document had to allege " 'the presence of that circumstance,' " and the circumstance had to " 'be determined by the trier of fact applying the reasonable doubt standard.' " *Id.* at 281, 786 A.2d 706 (quoting *Wadlow*, 335 Md. at 129, 642 A.2d 213). Reasoning that Count II of the indictment did not allege that the abuse caused the victim's death, and "the general reference at the conclusion of Count II to § 35C" did not "cure the problem," *id.*, because it did not provide "notice whether the State [was] seeking the enhanced penalty under § 35C(b)(2)," the Court vacated "that part" of Utley's conviction "represented by the sentence" in issue, and remanded for resentencing.[13] *Id.* at 282, 786 A.2d 706.

The *Fisher* Court relied on *Wadlow*, 335 Md. 122, 642 A.2d 213, in which the Court of Appeals analyzed Md.Code (1992 Repl.Vol., 1993 Supp.), Art. 27, § 286(a) and (f) (since recodified as C.L. §§ 5–602, 5–612). Section 286(a)(1), as it was then written, proscribed possession with intent to distribute a

---

13. The Court upheld Utley's conviction for felony murder in the second degree. 367 Md. at 282, 786 A.2d 706.

controlled dangerous substance. Section 286(f)(1)(ii) and (f)(3) provided that, if the substance was 448 grams or more of cocaine, then it was "mandatory upon the court to impose no less than 5 years' imprisonment," with additional limitations on parole. Although Wadlow's indictment charged possession with intent to distribute " 'over 448 grams of cocaine, in violation of Article 27, Section 286(a)(1),' " it made no mention of subsection (f). *Wadlow*, 335 Md. at 126, 642 A.2d 213 (quoting indictment). The *Wadlow* Court held that a sentence of four years imposed under Count I could not be increased to five years. *Id.* at 134, 642 A.2d 213. It reasoned, *id.* at 128–29, 642 A.2d 213:

> In Maryland, ... we have generally drawn a distinction between sentence enhancement provisions that depend upon prior conduct of the offender and those that depend upon the circumstances of the offense. In the former situation, involving recidivism, we have made it clear that determination of the requisite predicate facts is for the sentencing judge....

> In the latter case, however, where the legislature has prescribed different sentences for the same offense, depending upon a particular circumstance of the offense, we have held that the presence of that circumstance must be alleged in the charging document, and must be determined by the trier of fact applying the reasonable doubt standard.

Wadlow's conduct fell into the category in which the statute provided for a greater sentence based on the "particular circumstance" of the amount of narcotics that the defendant possessed. *See id.* at 126, 642 A.2d 213. The Court concluded that "when the State seeks the enhanced penalties provided by § 286(f) it must allege the necessary fact concerning the amount, and prove that fact beyond a reasonable doubt." *Id.* at 132, 642 A.2d 213. Yet, "the jury was not called upon to decide whether the amount of cocaine involved in the conviction under Count I was 448 grams or more." *Id.* at 133, 642 A.2d 213. The Court noted that "the language of Count I" mentioned the quantity, but "the body of the count and statute citation referred only to a violation of Art. 27, § 286(a)(1),"

and the jury instructions provided: " 'No specific quantity is required for you to find the intent to distribute. There is no specific amount below which the intent to distribute disappears and there is no specific amount above which the intent to distribute appears.' " *Id.*

With the cases discussed above in mind, we return to C.L. § 9–303. C.L. § 9–303(c)(1) provides for a five-year maximum. But, under C.L. § 9–303(c)(2), if "the official proceeding or report" against which a defendant retaliated "relates to a felonious violation of Title 5 of [the Criminal Law] article or the commission of a crime of violence as defined in [C.L.] § 14–101," the defendant may be sentenced to a maximum of twenty years. In the Criminal Information, appellant was charged with retaliating against Hicks "for reporting Drug Activity," a violation of Title 5 of the Criminal Law Article, and it referred specifically to C.L. § 9–303(c)(2). Thus, the circumstance of drug activity was alleged in the Information. Therefore, there is no issue here, as there was in *Fisher,* of a defective pleading. *See Fisher,* 367 Md. at 281–82 & n. 19, 786 A.2d 706 (vacating sentence "in view of the Maryland common law" and remanding for resentencing where "indictment did not allege the fact that the State needed to prove in order to enhance the penalty").

Complaints of illegal drug activity are, however, "the functional equivalent of an element of a greater offense," *Apprendi,* 530 U.S. at 494 n. 19, 120 S.Ct. 2348, because this is the basis on which appellant was exposed "to a punishment greater than that otherwise legally prescribed[.]" *Id.* at 483 n. 10, 120 S.Ct. 2348. Yet, the jury was not asked to determine whether the evidence proved those facts. Rather, it was only instructed that "the State must prove ... [that appellant retaliated] because the victim or witness either gave evidence in an official proceeding or reported a crime or delinquent act." Therefore, the jury returned a guilty verdict for "retaliation," without deciding whether Hicks's complaints concerned drug activity.

■ In *Apprendi,* 530 U.S. at 495, 120 S.Ct. 2348, where the sentence enhancement increased Apprendi's maximum sen-

tence from ten years to twenty years, the Supreme Court stated that "the differential here is unquestionably of constitutional significance." In this case, appellant's sentence quadrupled, from five years to twenty years, an increase which is also undoubtedly "of constitutional significance." The matter of illegal drug activity was not merely a sentencing "factor." *Id.* at 494 n. 19, 120 S.Ct. 2348. Under *Apprendi* and its progeny, the question of whether Hicks's complaints related to drug activity had to be "submitted to a jury, and proved beyond a reasonable doubt," *id.* at 490, 120 S.Ct. 2348, before the judge could sentence appellant to the greater offense of retaliation for reporting drug activity.

To be sure, the jury had ample evidence as to the alleged drug activity that Hicks perceived, and it heard Hicks's testimony that she was "reporting" the drug dealers "to the police...." Hicks further testified that she told appellant that she "had something to say. Meaning I was going to call the police because I was known for around here to call the police." But, the jury was never asked to determine whether Hicks's complaints pertained to drug activity. Rather, the jury was merely told that the State had to prove that appellant "intentionally harmed another or threatened to harm another, or damaged or destroyed property," and that appellant "did so with the intent of retaliating against the victim ... because the victim ... reported a crime or delinquent act."

We conclude that the Due Process Clause required that the circumstances allowing for the enhanced penalty should have been "submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348. That did not occur. Therefore, we shall vacate the sentence for retaliation and remand for resentencing under C.L. § 9–303(c)(1).

## II.

### A.

Appellant argues that "the trial court erred in excluding relevant evidence and limiting cross-examination that would

have impeached the credibility of the State's key witness." We pause to review additional facts.

As noted, prior to the presentation of evidence the State moved *in limine* to exclude evidence of a fire in Hicks's home in May 2005. The fire occurred a few days before a bullet went through Hicks's apartment window, and resulted in Hicks's temporary loss of custody of her children. The following colloquy is pertinent:

> [PROSECUTOR]: ... [T]he charges in this case are assault and handgun charges. They arise from an incident that occurred in November of '05, but they also relate to an incident that occurred in May of '05 in which ... a bullet went through the victim's window.
>
> The State's theory is that this was done in retaliation for the victim calling on drug dealers that are outside her home, dealing drugs outside her home.
>
> \* \* \*
>
> THE COURT: So what does that have to do with a fire?
>
> [PROSECUTOR]: It doesn't, Your Honor, which is why the State is asking that any testimony that the Defense wants to elicit about a fire be excluded. I don't believe it's relevant to the case.

Defense counsel responded that "approximately two days prior to the supposed[ ] shooting through the window ... there was a [grease] fire in Ms. Hicks' house." Appellant's counsel indicated that "although Ms. Hicks is going to deny the fact," appellant "kicked the door in" and rescued her two young children, who had been left unattended. Counsel claimed that this was relevant because Hicks "was blaming" appellant for the fact that her children were temporarily removed from her care after the fire. He said: "And that's sort of a motive for her not only to make this up, but to select my client as the person." In addition, he argued that it was relevant because "it shows a lack of a motive, that somebody would go and save somebody's children in a burning house and

then supposedly shoot through their window a month later because of some sort of call into the police department."

■ The court ruled: "I am going to grant the State's Motion to Exclude the fire in the victim's home. However, I will allow the Defense to ask Ms. Hicks if the reason she's telling this situation is because she blames [appellant] for her children being taken away from her without allusion to the fire." The court reiterated:

> You can't mention the fire. You can't mention the fact that you just said that your client ran into the house to rescue the children. But you can ask Ms. Hicks if she's telling, making this up, the motive for her saying this is because she blames Mr. Parker for her children being removed from the home. You have to first establish that the children were removed from the home, lay a foundation. But once you've established the foundation, then you could ask if her motive for this, what the Defense alleges is her story, is because she believes that the Defendant is somehow responsible for the children being removed from her home.

On cross-examination, defense counsel asked Hicks if her children were living with her in May 2005, when the gunshot pierced her window. She replied that they were not living with her from April 2005 until January 2006. Appellant's counsel asked, "Now why were your kids not with you?" and "Were you aware of the incident where [appellant] saved your children?" But, the court sustained the prosecutor's objections. At the bench, the court admonished defense counsel, stating: "I was very clear that this was not to come in this case. . . . You made the record and I ruled and that's the end of it." The court then granted the State's motion to strike "any question about any saving of any children."

On appeal, appellant argues: "It was the defense's theory of the case that Ms. Hicks' [sic] was lying at trial because she blamed Appellant for losing her children. The trial court precluded testimony about the fire that Appellant alleged gave rise to Ms. Hicks' motivation to testify falsely." According to appellant, "defense counsel should have been allowed to cross-

examine Ms. Hicks about the fire and her resulting bias against appellant," and "the trial judge's limitation on Appellant's cross-examination of the state's key witness impeded Appellant's right to a fair trial."

Appellant posits: "One can hardly imagine a more traumatic event than losing custody of one's children. If Ms. Hicks truly blamed Appellant for this event, it is certainly conceivable that she may have falsely accused Appellant." He adds:

The "constitutionally required threshold level of inquiry" included inquiry into the fire that resulted in Ms. Hicks losing custody of her children. The jury was entitled to know the circumstances surrounding that fire, that Appellant saved her children, Ms. Hicks' subsequent feelings towards Appellant and how that might affect her decision to testify falsely.

Without this evidence, argues appellant, the jury lacked "sufficient information to make a 'discriminating appraisal' of Ms. Hicks' possible motives for testifying falsely." (Quoting *Marshall v. State*, 346 Md. 186, 194, 695 A.2d 184 (1997)). Claiming that the court "eroded the purpose of cross-examination," Parker contends that "reversal is mandated."

The State counters that "the trial court properly exercised its discretion in limiting Parker's cross-examination of the victim on unrelated matters." It contends that the "jury was *not* 'entitled' to hear 'the circumstances surrounding that fire,'" because the trial court "properly determine[d] that unsubstantiated claims about rescuing children from a fire were not relevant to whether Parker threatened Hicks for her calls to police six months later." Moreover, it maintains that appellant "was permitted to explore any bias the victim may have had against him; he simply chose not to." In this regard, the State points out that appellant "did not ask Hicks if she blamed Parker for the removal of her children. Thus, he did not attempt to establish the motive for false testimony[,] which the court had expressly allowed in its pretrial ruling."

■ Cross-examination is a "right guaranteed by the common law." *Myer v. State,* 403 Md. 463, 476, 943 A.2d 615 (2008). In addition, pursuant to the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights, a criminal defendant has the right to " 'cross-examine a witness about matters which affect the witness's bias, interest or motive to testify falsely.' " [14] *Martin v. State,* 364 Md. 692, 698, 775 A.2d 385 (2001) (citation omitted); *see Merzbacher v. State,* 346 Md. 391, 413, 697 A.2d 432 (1997); *Leeks v. State,* 110 Md.App. 543, 554, 678 A.2d 80 (1996); Md. Rule 5–616.[15] *See also Churchfield v. State,* 137 Md.App. 668, 683, 769 A.2d 313 (stating that cross-examination as to potential bias "is 'the most important impeachment technique because "even an untruthful man will not usually lie without a motive." ' ' ") (citations omitted), *cert. denied,* 364 Md. 536, 774 A.2d 409 (2001); JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 1302(E) (3d ed. 1999 & 2008 Supp.) (same).

■ Hicks was the State's key witness. To be sure, " 'cross-examination of a government "star" witness is important....' " *United States v. Novaton,* 271 F.3d 968, 1006 (11th Cir.2001) (citations omitted), *cert. denied,* 535 U.S. 1120, 122 S.Ct. 2345, 153 L.Ed.2d 173 (2002); *see Washington v. State,* 180 Md.App. 458, 489, 951 A.2d 885 (2008) (same). As

---

**14.** The Sixth Amendment is made applicable to the States via the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Merzbacher v. State,* 346 Md. 391, 411–12, 697 A.2d 432 (1997).

**15.** Rule 5–616. **Impeachment and rehabilitation—Generally.**

(a) **Impeachment by inquiry of the witness.** The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at:

\* \* \*

(4) Proving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]

\* \* \*

(6) Proving the character of the witness for untruthfulness by (i) establishing prior bad acts as permitted under Rule 5–608(b) or (ii) establishing prior convictions as permitted under Rule 5–609.

this Court said in *Leeks,* 110 Md.App. at 554, 678 A.2d 80, " 'the absolute preclusion of cross-examination pertaining to a witness's motive for testifying would be an abuse of discretion,' . . . especially . . . when the witness the defendant wishes to cross-examine is the prosecution's key witness." (Citation omitted.) Nevertheless, a criminal defendant's constitutional right to cross-examination is not boundless. *Pantazes v. State,* 376 Md. 661, 680, 831 A.2d 432 (2003). The question is "whether the trial judge imposed limitations upon cross-examination that inhibited the ability of the defendant to receive a fair trial." *Id.* at 681–82, 831 A.2d 432; *see Thomas v. State,* 143 Md.App. 97, 109–11, 792 A.2d 368, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002).

Clearly, the Court did not totally preclude appellant from cross-examining Hicks. "Managing the scope of cross-examination is a matter that falls within the sound discretion of the trial court." *Simmons v. State,* 392 Md. 279, 296, 896 A.2d 1023 (2006). As the Court has said, "trial courts retain wide latitude in determining what evidence is material and relevant, and to that end, may limit, in their discretion, the extent to which a witness may be cross-examined for the purpose of showing bias." *Merzbacher,* 346 Md. at 413, 697 A.2d 432. Moreover, trial judges are entitled " 'to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues . . . or interrogation that is . . . only marginally relevant.' " *Smallwood v. State,* 320 Md. 300, 307, 577 A.2d 356 (1990) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). *See also* Md. Rule 5–402 ("Evidence that is not relevant is not admissible."); Md. Rule 5–403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury, or by considerations of . . . waste of time . . . ."); Md. Rule 5–611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence . . . .").

In *Oken v. State,* 327 Md. 628, 669, 612 A.2d 258 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993), the Court stated: "Generally speaking, the scope of examination of witnesses at trial is a matter left largely to the discretion of the trial judge and no error will be recognized unless there is clear abuse of such discretion." Notably, "where a trial court's ruling is reasonable, even if we believe it might have gone the other way, we will not disturb it on appeal." *Fontaine v. State,* 134 Md.App. 275, 288, 759 A.2d 1136 (citations and quotation marks omitted), *cert. denied,* 362 Md. 188, 763 A.2d 734 (2000).

With these principles in mind, we return to the case *sub judice.* As indicated, appellant theorizes that Hicks blamed him because, when he rescued her children from the fire, it was discovered that the children had been left alone, which caused Hicks, temporarily, to lose custody of her children. According to appellant, Hicks concocted the story of assault for revenge.

During cross-examination, Parker established that Hicks's children did not live with her from April 2005 to January 2006. Moreover, the court permitted appellant "to ask Ms. Hicks if the reason she's telling this situation is because she blames [appellant] for her children being taken away from her." Appellant claims, however, that "a bald question" as to Ms. Hicks' motive was "insufficient" to "flesh out the important details," and "likely would have resulted in a denial that the jury may well have accepted at face value." We cannot speculate about the answer to a question that was not posed.

The court must use a "balancing test" to avoid "stray[ing] into collateral matters which would obscure the trial issues and lead to the factfinder's confusion." *Smallwood,* 320 Md. at 307–08, 577 A.2d 356. Here, the court was entitled to conclude that the relevance of the fire was simply too attenuated, and that establishing a foundation for the evidence would have required inquiry into tangential matters (i.e., the fire, appellant's role in rescuing the children, Hicks's loss of custody of her children, Hicks's placement of blame on appellant,

and Hicks's retribution). We conclude that the court did not abuse its discretion in limiting appellant's inquiry so as to avoid a trial on collateral matters, and to avoid "confusion of the issues, or misleading the jury, or ... undue delay, [or] waste of time...." Md. Rule 5–403.

## B.

At trial, the court addressed the State's motion *in limine* to exclude testimony from Hicks regarding what defense counsel characterized as "numerous claims" filed by Hicks "against numerous different people," which were false and resulted in stets or nolle prosequis. Claiming that the evidence was relevant, defense counsel argued:

> [I]t goes towards [showing] that she makes claims against people that are false. And if through cross examination she says she doesn't do that, then I'd like to hear the circumstances under which every one of these cases that she's brought have been assaults, harassments, ex partes. Why all of those have been either been [sic] nolle prossequied or put on the stet docket.

The court ruled: "I'm going to grant the State's Motion to Exclude that. You won't be allowed to explore any—if you can demonstrate that she's lied about something, that's fine, but whether she filed complaints with the police department or not is not relevant and a collateral issue in this Court's regard."

During trial, appellant's counsel began to query Hicks about whether she had brought charges against a specific individual. The court asked counsel to approach the bench, at which point the prosecutor objected "to this line of questioning." The following ensued:

> THE COURT: [Appellant's counsel], we've already been through—that's why we have motions in limine so we can resolve this. If you're telling me that she made reports and that these cases got steaded [sic] or null process [sic].

[APPELLANT'S COUNSEL]: They actually were written by the police officer, who determined after speaking to all the witnesses—

THE COURT: I don't care what the police determined. Unless you can demonstrate that she's not telling the truth. . . .

Appellant argues that "defense counsel should have been allowed to cross-examine Ms. Hicks about false police reports that she filed." He characterizes evidence of unfounded charges as a "highly relevant topic that would have shed light on Ms. Hicks' credibility."

According to the State, "Parker's appellate contentions are . . . handicapped by the fact that not only is there no support in the record for his claims, but they are in fact demonstrably false." It continues:

Parker characterizes the evidence as proof of 'false police reports.' . . . The record reflects, however, that at best, what Parker was attempting to offer was proof of reports to the police that did not result in convictions. That is a far cry from proof of a false report.

The State argues: "Patently, neither a stet nor a nolle prosequi carries any implication whatsoever that the underlying charges are 'false reports.' . . . Neither involves any factual finding on the merits of the charges whatsoever." Therefore, the State maintains that cross-examination regarding Hicks's complaints would not have "had any bearing whatsoever on her general character for truthfulness. . . ." In the State's view, "Parker's demand that he be allowed free rein to cross-examine Hicks on 'every one' of her prior complaints to see why the prosecutor chose to stet or nolle pros the case fails virtually every test to be applied for the admission of evidence."

Rule 5–608(b) is pertinent. It provides:

**Rule 5–608. Evidence of character of witness for truthfulness or untruthfulness.**

* * *

(b) **Impeachment by examination regarding witness's own prior conduct not resulting in convictions.** The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.

The flaw in appellant's position is that he did not establish that Hicks filed "false" police reports. *See generally* C.L. § 9–501(a) (knowingly making false report is a misdemeanor). As the State indicates, Parker "was attempting to offer ... proof of reports to the police that did not result in convictions." However, neither a "stet" nor a nolle pros is tantamount to a false report. *See LaFaivre v. State,* 338 Md. 151, 155–58, 656 A.2d 789 (1995). Indeed, "where charges have been stetted, the accused remains liable to be proceeded against under the same charging document...." *Id.* at 158, 656 A.2d 789. The *LaFaivre* Court added:

"[W]hile a nolle prosequi discharges the defendant on the charging document or count which was nolle prossed, and while it is a bar to any further prosecution under *that* charging document or count, a nolle prosequi is *not* an acquittal or pardon of the underlying offense and does not preclude a prosecution for the same offense under a different charging document or different count."

*Id.* at 155–56, 656 A.2d 789 (quoting *Ward v. State,* 290 Md. 76, 84, 427 A.2d 1008 (1981)) (emphasis in *LaFaivre*).

Accordingly, these dispositions did not establish the falsity of Hicks's complaints. Without a basis for determining that Hicks's complaints were false, there was no evidence of her misconduct.

*State v. Cox,* 298 Md. 173, 468 A.2d 319 (1983), on which appellant relies, is inapposite. Cox was tried for first degree

rape; he claimed he was not the assailant. *Id.* at 176, 468 A.2d 319. There, as here, the victim's identification of the assailant was the only direct evidence establishing the identity of the assailant. *See id.* at 177, 468 A.2d 319. On cross-examination, in an attempt to establish that the victim was lying, Cox sought to question the victim about her testimony at the trial of a different defendant. *Id.* At that earlier trial, the victim testified initially that the accused criminally assaulted her, but she recanted when she was cross-examined, " 'admitt[ing] that she did not tell the truth.' " *Id.* (quoting defense counsel's proffer). The trial court precluded the proffered cross-examination, but the Court of Appeals reversed. *Id.* at 184, 468 A.2d 319. It remarked: "We have … been steadfast in holding that *mere accusations* of crime or misconduct may not be used to impeach." *Id.* at 179, 468 A.2d 319 (emphasis added). But, the Court observed that, in the case before it, "the witness had actually lied *under oath* in a similar situation." *Id.* at 183, 468 A.2d 319 (emphasis added).

Unlike *Cox*, in which the witness "recanted the charge during cross-examination," *id.* at 177, 468 A.2d 319, there was no evidence that Hicks ever recanted as to any complaints she reported to the police. And, as we have said, the resolution of charges through stets and nolle prosequis did not establish the falsity of Hicks's complaints. Therefore, the court did not abuse its discretion by precluding appellant from impeaching Hicks with respect to her prior complaints to the police concerning unrelated events. As the State puts it, "Even if there was some connection between a stetted assault charge and Hicks' credibility, it would be so tenuous that the trial court was perfectly within its discretion to exclude it" under Md. Rule 5–402. Moreover, we agree with the State that "Hicks is not competent to speak for the prosecutorial decisions of the State's Attorney's office."

### III.

 Appellant contends: "Officer [Troy] Jackson should have been allowed to testify that in his opinion Ms.

Hicks was a liar." [16] Again, we pause to review additional facts relevant to this contention.

The State moved *in limine* to bar evidence from the police as to phone calls made by Hicks to the police. The prosecutor explained that "the State is going to present testimony that Ms. Hicks made several phone calls to the police. I'm not attempting to exclude that. What I believe the Defense is also going to attempt to do is indicate that those phone calls were unfounded and I don't believe Defense has proper foundation testimony [for] that." The following ensued:

THE COURT: What testimony are you going to try to elicit from the State with regard to phone calls?

\* \* \*

[APPELLANT'S COUNSEL]: If Ms. Hicks has made an exorbitant amount of phone calls ... [t]o the police department complaining about numerous things. And that officers have had to show up and then have realized that these complaints are unfounded and I have an officer that is going to testify.

THE COURT: How is that relevant to—the question is whether Mr. Parker shot a gun through Ms. Hicks' window.

[APPELLANT'S COUNSEL]: It goes to her credibility ... because if she's calling the police all the time with unfounded accusations—

THE COURT: Does that make it any less or more likely that Mr. Parker did this?

[APPELLANT'S COUNSEL]: Yes, it makes is [sic] less likely.

THE COURT: ... I'm going to—grant the request to exclude any references as to how many complaints Ms. Hicks makes to the police department.

---

16. This issue overlaps with the one concerning cross-examination of Ms. Hicks. But, it involves testimony of a character witness, rather than cross-examination of the complaining witness. Appellant raised the issue as a separate matter before the trial court and on appeal.

At trial, defense counsel sought to call Officer Troy Jackson as a character witness. However, Jackson did not appear in court, even though he had been "summonsed." When Jackson did not appear, defense counsel did not mention that he wanted to enforce the subpoena. Instead, he proffered that the officer would testify that he responded to Hicks's home the day after the fire in May 2005, when Hicks claimed appellant had assaulted her. But, the officer did not "grant any sort of charges against [appellant]. He has been called out there numerous times for the same.... And every time he has determined that there was not a valid charge here...." According to defense counsel, Jackson "would say that [Hicks] brings unfounded charges against people. That she tries to lie on people is what he says." Appellant's attorney added: "Because every time he goes out there and talks to all the witnesses whenever she makes an allegation, there's either no witnesses at all or there's witnesses saying exactly the opposite and no other evidence showing anything else."

The following ensued:

[APPELLANT'S COUNSEL]: ... Furthermore, she brought an IUD [sic] report, at least one against him, for not arresting people when she told him to arrest people....

THE COURT: And what possible relevance does that have?

[APPELLANT'S COUNSEL]: Again, it goes towards her credibility again.

\* \* \*

THE COURT: So you're saying instead of it being your client's word against Ms. Hicks, now you're saying it's Officer Jackson's word against Ms. Hicks in a totally unrelated incident.

[APPELLANT'S COUNSEL]: Officer Jackson has had prior experience with Ms. Hicks.

THE COURT: All right. Well we're not waiting for Officer Jackson because I wouldn't let him get on the stand if that's what he's going to say anyway.... His opinion about who's

truthfulness [sic] is not appropriate. That's what jury's [sic] are for.

Appellant contends that "Officer Jackson's testimony fell squarely within the realm of Md. Rule 5–608(a)(1)(B)," pertaining to impeachment by a character witness. In his view, "Officer Jackson should have been allowed, pursuant to Md. Rule 5–608(a)(3)(B) to explain the reasonable basis for his opinion."

The State maintains that "the trial court did not abuse its discretion in determining that the proffered testimony of the police officer lacked an adequate foundation to be admissible." Further, the State contends that "[t]he proffer failed to prove that Officer Jackson had a reasonable basis for his opinion regarding Hicks's truthfulness." It adds: "[W]hatever probative value the testimony may have had was outweighed by the risk of prejudice, confusion, or misleading the jury." The State also asserts:

> The record showed, at best, that the police could not find corroboration for some of Hicks's complaints,[1] and that for whatever reason, her complaints did not result in criminal trials. This by no means indicates that Hicks was making a false report in the prior cases, let alone in the instant case, but there was a legitimate risk that the jury might interpret it so; indeed, this was Parker's goal.

In addition, the State points out that appellant did not ask the court to enforce the subpoena to compel Officer Jackson's presence. Because Jackson did not appear, it posits that any error in excluding his testimony was harmless beyond a reasonable doubt.

Arguably, appellant's claim is not preserved. This is because Officer Jackson did not appear at trial, and appellant never sought to compel his presence by enforcing the subpoena through a request for a body attachment. *See Whack v. State,* 94 Md.App. 107, 118–19, 615 A.2d 1226 (1992) ("[I]t is the responsibility of the court to issue a body attachment (*upon request*) where a duly summoned witness fails to appear.") (emphasis added), *cert. denied,* 330 Md. 155, 622 A.2d

1196 (1993). *Cf. Rosov v. Md. State Bd. of Dental Examiners,* 163 Md.App. 98, 117, 877 A.2d 1111 (2005) (concluding that Rosov's "own failure to subpoena the witness" deprived him of the opportunity to cross-examine the witness); *Travers v. Balt. Police Dep't,* 115 Md.App. 395, 418, 693 A.2d 378 (1997) (recognizing that Travers "effectively waived his right to complain about a denial of an opportunity to cross-examine" a witness because he "failed to exercise his right to subpoena" that witness). Given that Jackson did not appear, and appellant never sought a body attachment for him, Jackson could not have testified in accordance with the proffer of defense counsel, regardless of the court's ruling.

Even assuming that the issue is preserved, appellant would not prevail. We explain.

Md.Code (2006 Repl.Vol., 2008 Supp.), § 9–115 of the Courts and Judicial Proceedings Article ("C.J.") provides:

**§ 9–115. Use of character witness.**

Where character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character, either in person or by deposition, in any suit, action or proceeding, civil or criminal, in any court or before any judge, or jury of the State.

Md. Rule 5–608(a) governs the admission of testimony by a character witness. It provides, in part:

**Rule 5-608. Evidence of character of witness for truthfulness or untruthfulness.**

(a) **Impeachment and rehabilitation by character witnesses.** (1) Impeachment by a Character Witness. In order to attack the credibility of a witness, a character witness may testify (A) that the witness has a reputation for untruthfulness, or (B) that, in the character witness's opinion, the witness is an untruthful person.

* * *

(3) Limitations on character witness's testimony.

. * * *

(B) On direct examination, a character witness may give a reasonable basis for testimony as to reputation or an opinion as to the character of the witness for truthfulness or untruthfulness, but may not testify to specific instances of truthfulness or untruthfulness by the witness. . . .

Jackson's opinion that Hicks was untruthful falls within Md. Rule 5–608(a)(1)(B). But, the content of the proffered testimony involved "specific instances of truthfulness or untruthfulness by the witness," which is barred by Md. Rule 5–608(a)(3)(B). Furthermore, to admit Jackson's opinion testimony that Hicks was untruthful, the court first would have had to determine, as a "threshold" matter, that there was "an adequate basis" for Jackson's personal opinion. *Durkin v. State*, 284 Md. 445, 453, 397 A.2d 600 (1979); *see also Jensen v. State*, 355 Md. 692, 701–02, 736 A.2d 307 (1999). The fact that suspects disappeared by the time Officer Jackson responded to Hicks's calls did not establish the falsity of Hicks's complaints.

## IV.

Appellant argues that the trial court erred in admitting Hicks's statement that the detective " 'took me back down to the police station and that's when he put me in a hotel, which is considered as witness protection.' " Again, additional facts are relevant to this contention.

Hicks testified that a detective drove her around the neighborhood "in an unmarked car and he said that they won't be able to see me. Because I told him I was scared and I didn't want to go back." She continued:

And he asked me did I see they guy who made the statement that he was going to shoot through my window. I told him no I didn't see him. He took me back down to the police station and that's when he put me in a hotel,

which is considered as witness protection. And told me, don't go back around the neighborhood. If I had to go home for anything to call—

[APPELLANT'S COUNSEL]: Objection, your Honor.

THE COURT: Overruled.

[HICKS]: To call them and they would issue a patrol car to escort me to my house.

Appellant's counsel asked Hicks if the May 2005 shooting incident "was ... at the time that you said you were put into witness protection," and "who was the officer that put you into witness protection?" Hicks explained that Detective Stambaugh placed her in witness protection after the November 2005 incident.[17] The following colloquy is pertinent:

[APPELLANT'S COUNSEL]: Now how soon after this supposed [November 2005] incident did you talk with Detective Stambaugh?

[HICKS]: I'll say when the police arrived, maybe something[.]

[APPELLANT'S COUNSEL]: And was it at that point that you said you were put into witness protection?

[HICKS]: Yes.

Appellant argues that, "even if this evidence was minimally relevant, its probative value was far outweighed by its prejudicial effect." According to appellant, witness protection is "a fairly uncommon phenomenon" and reference to it "was highly likely to inflame the passions of the jury." Moreover, he asserts that "the fact that the police placed Ms. Hicks' [sic] in witness protection has no bearing on whether the Appellant threatened Ms. Hicks."

The State counters that this issue is not preserved because appellant "failed to note a timely objection to the victim's remark." It maintains: "Neither the State nor this Court can determine from this record which part of Hicks's statement

---

17. Later, Hicks was again asked who placed her in witness protection. She testified: "Officer Tiffany Brown [a]nd another officer. I don't remember."

was specifically being·objected to by Parker." The State adds: "What is clear is that Parker did not object immediately after the 'hotel' comment, but instead waited until Hicks had related comments supposedly made to her by police," such that the court could have thought he made a hearsay objection.

Alternatively, the State contends that the evidence was relevant and not unfairly prejudicial. In its view, the statement was relevant to prove that Hicks was in fear, an element of assault. Further, the State claims that "in every case where the police arrest a defendant, it demonstrates that the police placed some credence in the accusations of a witness. That the police undertook action in light of a victim's complaints cannot be held to be unfairly prejudicial."

Finally, the State maintains that any error was harmless beyond a reasonable doubt. To support its view, the State insists that "there is no possibility that the one-time use of the words 'witness protection' contributed to the verdict against Parker."

Even assuming, *arguendo*, that appellant's objection was timely, his claim is unavailing. Hicks's statement regarding witness protection was relevant because it helped establish fear, an element of assault under one of its common law definitions. *See Dixon v. State*, 302 Md. 447, 458–59, 488 A.2d 962 (1985); *see also* C.L. § 3–201 (assault defined at common law). As the State remarked in its brief, "the fact that Hicks felt so frightened that she was given alternative living quarters is probative of the element of fear, necessary to the State's case." To be sure, this was fear expressed after the fact. But, the jury could have concluded that Hicks would not have experienced fear after the incident if the incident itself had not frightened her as it was occurring.

Relevant evidence should be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice...." Md. Rule 5–403; *see Carter v. State*, 374 Md. 693, 705, 824 A.2d 123 (2003); *Andrews v. State*, 372 Md. 1, 19, 811 A.2d 282 (2002). In *Weiner v. State*, 55 Md.App. 548, 555, 464

A.2d 1096 (1983), *aff'd,* 302 Md. 550, 489 A.2d 1119 (1985), we clarified that "prejudice in this context" means "an undue tendency to persuade the jury to decide the case on an improper basis, usually an emotional one." In our view, Hicks's testimony was not unfairly prejudicial. As the State notes, there is no evidence in the record that witness protection is "fairly uncommon," as appellant insists, such that a reference to it would inflame the jury's emotions.

We conclude that the court did not abuse its discretion in admitting the statement. A ruling on relevance is "quintessentially" within the discretion of the trial judge. *Best v. State,* 79 Md.App. 241, 259, 556 A.2d 701, *cert. denied,* 317 Md. 70, 562 A.2d 718 (1989); *see Grandison v. State,* 341 Md. 175, 206, 670 A.2d 398 (1995), *cert. denied,* 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996); *Sutton v. State,* 139 Md.App. 412, 448, 776 A.2d 47, *cert. denied,* 366 Md. 249, 783 A.2d 223 (2001). "[A] decision to admit relevant evidence over an objection that the evidence is unfairly prejudicial will not be reversed absent an abuse of discretion." *Williams v. State,* 342 Md. 724, 737, 679 A.2d 1106 (1996), *overruled on other grounds by Wengert v. State,* 364 Md. 76, 89, 771 A.2d 389 (2001); *see Carter,* 374 Md. at 705, 824 A.2d 123; *Merzbacher,* 346 Md. at 405, 697 A.2d 432; *White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991); *Hunt v. State,* 321 Md. 387, 425, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991).

**JUDGMENTS OF CONVICTION AFFIRMED. SENTENCE FOR RETALIATION VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR NEW SENTENCING. COSTS TO BE PAID TWO–THIRDS BY APPELLANT, ONE–THIRD BY MAYOR AND CITY COUNCIL OF BALTIMORE.**