65 A.3d 785

Marilyn CLARK, et al.

v.

PRINCE GEORGE'S COUNTY, Maryland, et al.

No. 2372, Sept. Term, 2011.

Court of Special Appeals of Maryland.

May 2, 2013.

550

Michael J. Winkelman, (McCarthy, Winkelman & Morrow, LLP, Bowie, MD, David Haynes, Cochran Firm, Washington, D.C.), on brief, for Appellant.

William A. Snoddy, (M. Andree Green, County Attorney, on the brief), Upper Marlboro, MD, for Appellee.

Panel: EYLER, DEBORAH S., KEHOE, FREDERICK J. SHARER, (Retired, Specially Assigned), JJ.

EYLER, J.

On January 24, 2007, Keith Washington, at the time a member of the Department of Homeland Security of the Prince George's County Police Department, used his service weapon to shoot Brandon Clark and Robert White, while they were inside his house on a scheduled delivery of bed rails from a furniture store. Clark died at the scene and White sustained permanent physical injuries.

In the Circuit Court for Prince George's County, Marilyn Clark and Chris Furbush, individually and as co-personal representatives of Clark's estate, and White, the appellants, sued Prince George's County ("County"), the appellee, and Washington alleging numerous tort claims and seeking damages for Clark's wrongful death and White's injuries. The only claims that are relevant to this appeal are the common law tort claims against the County, directly, for negligent hiring, retention, and entrustment; a vicarious liability claim against the County for certain common law torts committed by Washington against Clark and White; and a Maryland constitutional tort claim against the County.[1]

The circuit court dismissed the direct common law tort claims against the County on the ground of governmental

---

1. Because the only constitutional violation claim was brought under the Maryland constitution, we shall simply refer to it as the constitutional tort claim.

immunity and bifurcated the case for trial. In a trial against the County for vicarious liability for the common law torts of Washington, who by then was no longer a party, the court granted judgment in favor of the County on the ground that Washington was not acting within the scope of his employment when he shot White and Clark, as a matter of law. Before the trial on the constitutional tort claim against the County, the court granted a motion *in limine* to exclude certain evidence regarding Washington's mental health history and alleged prior acts of violence. Ultimately, the court granted summary judgment in favor of the County on that claim as both parties agreed that without the excluded evidence the appellants could not make out a *prima facie* case.

The appellants present four questions for review, which we have reworded:

 I. Did the circuit court err in dismissing the direct common law tort claims against the County, for negligent hiring, retention, and entrustment, on the ground of governmental immunity?

 II. Did the circuit court err in granting judgment in favor of the County on the vicarious liability common law tort claim against it, on the ground that as a matter of law Washington was not acting within the scope of his employment at the time of the shooting?

 III. Did the circuit court err in ruling that the doctrine of collateral estoppel did not operate to preclude the County from disputing certain underlying alleged facts?

 IV. Did the circuit court err in granting the County's motion *in limine* to exclude evidence of Washington's prior mental history and allegedly violent behavior?

For the following reasons, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

On January 24, 2007, Clark and White were working for a trucking subcontractor making deliveries for Marlo's Furniture Store. One of their assignments that day was to deliver replacement bed rails to Washington's house in Accokeek,

Prince George's County. Washington had purchased a bed for his master bedroom from Marlo's, but the bed rails were defective. Clark and White were supposed to deliver the replacement bed rails between 2:30 p.m. and 5:30 p.m., set them up, and take the defective rails.

Washington had taken part of the day off from work so he could be home for the delivery. At the time, Washington worked at the Department of Homeland Security Office of the Prince George's County Police Department, as the Deputy Chief Administrator. He was responsible for the day-to-day operations of that department, which coordinated the various public safety agencies in Prince George's County. He was a sworn police officer, and in the past had functioned in a police role, but did not do so in his position with the Department of Homeland Security. He had been detailed to that department since 2004.

White and Clark arrived late to Washington's house, at 7:30 p.m. By then, Washington was eating dinner with his wife and six-year-old daughter. He answered the door and accompanied Clark and White, who were carrying the box containing the new bed rails, to the master bedroom on the second floor of the house. Washington's wife and daughter stayed in the kitchen. A few minutes after the three men entered the master bedroom, Washington shot Clark and White. Neither Clark nor White had known that Washington was a police officer.

On January 24, 2008, the appellants filed a 14–count complaint against the County and Washington. It set forth a constitutional tort claim against the County for deliberate indifference to the rights of Clark and White; several common law tort claims against Washington; common law tort claims for negligent hiring, retention, and entrustment against the County; and a vicarious liability claim against the County for the common law torts of Washington.

As noted, the common law tort claims against the County, including the negligent hiring, retention, and entrustment claims, were dismissed on the basis that the County was protected from liability by governmental immunity. For the

County, that left the vicarious liability claim and the constitutional tort claim. The court bifurcated the vicarious liability and constitutional tort claims for trial.

On March 23, 2009, a jury trial against Washington for certain common law torts and against the County for vicarious liability for Washington's common law torts commenced. It ended in a hung jury, which prompted the court to declare a mistrial. Before re-trial, the appellants voluntarily dismissed the claims against Washington, without prejudice. Beginning January 25, 2010, the trial went forward against the County on the sole theory that it was vicariously liable for Washington's torts. At the close of the appellants' case-in-chief, the trial court granted judgment in favor of the County on the ground that, on the evidence adduced, Washington was not acting within the scope of his employment as a police officer, as a matter of law, when he shot Clark and White.

Also as noted, before the separate trial against the County on the constitutional tort claim, the County filed a motion *in limine* seeking to exclude evidence of Washington's mental health history and prior allegedly violent acts. At a hearing on November 14, 2011, the court granted the motion on the basis of relevancy, ruling that the evidence was too attenuated to be probative of whether the County was on notice that Washington likely would cause physical harm to people delivering furniture inside his house. The appellants agreed that, with that evidence excluded, they could not prove their constitutional tort claim against the County. Accordingly, summary judgment was granted to the County.

We shall include additional information as necessary to our discussion of the issues.

## DISCUSSION

### I.

*Dismissal of The Direct Claims Against The County for Negligent Hiring, Retention, and Entrustment*

■ The appellants contend the circuit court erred in dismissing the direct common law tort claims against the County

for negligent hiring, retention, and entrustment. The essence of those claims was that the Prince George's County Police Department, a law enforcement agency of the County, breached a duty of care in hiring Washington as a police officer, retaining him as a police officer, and entrusting him with a service revolver; and that the breaches proximately caused Clark's death and White's injuries at Washington's hands. Those tort claims against the County were dismissed for failure to state a claim for which relief may be granted, based on governmental immunity.

The County's primary response to the appellants' contention is that the circuit court's ruling was legally correct. In the alternative, it responds that, even if the ruling was not correct, the tort claims would not have survived summary judgment in any event because the evidence on which they were based was the same evidence that was ruled inadmissible prior to trial on the constitutional tort claim, and would have been ruled inadmissible for the same reasons in this trial.

The standard of review of the grant of a motion to dismiss for failure to state a claim for which relief can be granted is *de novo*. *Fioretti v. Maryland State Bd. of Dental Exam'rs*, 351 Md. 66, 71–72, 716 A.2d 258 (1998). "In reviewing the grant of a motion to dismiss, we must determine whether the complaint, on its face, discloses a legally sufficient cause of action. An appellate court should presume the truth of all well-pleaded facts in the complaint, along with any reasonable inferences derived therefrom." *Id.* at 72, 716 A.2d 258 (citations omitted); *see also Schisler v. State*, 177 Md.App. 731, 742, 938 A.2d 57 (2007) (explaining that "[t]he standard for reviewing the grant of a motion to dismiss is whether the trial court was legally correct.").

■ Maryland law is well settled that a county (or municipality) generally enjoys immunity against common law tort liability arising out of acts that are governmental, as opposed to acts that are private or proprietary. *DiPino v. Davis*, 354 Md. 18, 47, 729 A.2d 354 (1999) ("A local government entity is liable for its [common law] torts if the tortious conduct occurs

while the entity is acting in a private or proprietary capacity, but, unless its immunity is legislatively waived, it is immune from liability for tortious conduct committed while the entity is acting in a governmental capacity."); *see also Ashton v. Brown,* 339 Md. 70, 101, 660 A.2d 447 (1995) (citing *Clea v. City of Baltimore,* 312 Md. 662, 667, 541 A.2d 1303 (1988), *superseded by statute,* Md.Code (1984, 2004 Repl.Vol.), § 12–101(a) of the State Government Article, *as recognized in D'Aoust v. Diamond,* 424 Md. 549, 586, 36 A.3d 941 (2012)).

In *Williams v. Prince George's County,* 112 Md.App. 526, 553, 685 A.2d 884 (1996), a case arising out of the actions of police officers, common law tort claims were brought against Prince George's County. This Court explained that "[c]ounties are shielded from tort liability for governmental actions unless the General Assembly has specifically waived the immunity of the municipality." *Id.* at 553, 685 A.2d 884 (footnote omitted and citing *Md.–National Capital Park and Planning Comm. v. Kranz,* 308 Md. 618, 622, 521 A.2d 729 (1987)). We concluded that there had been no waiver of such immunity for Prince George's County, and that the Local Government Tort Claims Act of the Courts and Judicial Proceedings Article ("CJP"), does not specifically waive immunity for common law tort claims against a County or municipality in its own capacity, for governmental actions. *Id.* at 554, 685 A.2d 884.[2]

■ The operation by a county of its police department is quintessentially governmental. *See Wynkoop v. Hagerstown,* 159 Md. 194, 201, 150 A. 447 (1930) ("The protection of the citizen against pestilence, disease, violence, or disorder, is essentially a governmental function to be exercised by the state under its police power."). Accordingly, the circuit court correctly ruled that the County could not be sued in its own

---

2. At the time *Williams* was written, the Local Government Tort Claims Act ("LGTCA") was codified at Md.Code (1974, 1995 Repl.Vol.), sections 5–401 *et seq.* of the Courts and Judicial Proceedings Article ("CJP"). In 1997, the LGTCA was renumbered as CJP section 5–301 *et seq.* by Acts 1997, c. 14, § 9, eff. April 8, 1997. All further references to the LGTCA in this opinion are to Md.Code (1974, 2010 Repl.Vol.) sections 5–301 *et seq.*

capacity for common law tort liability, including for the torts of negligent hiring, retention, or entrustment regarding Washington. The alleged acts or omissions of the County in that regard were governmental, and therefore the county was shielded from tort liability for them by governmental immunity.

The appellants argue that *Jones v. State,* 425 Md. 1, 38 A.3d 333 (2012), changed the law of immunities regarding common law tort claims for negligent hiring, retention, and supervision. They are incorrect. *Jones* did not involve allegations of common law tort liability against a *local government.* It involved allegations of common law tort liability against *the State of Maryland.*

In *Jones,* two deputy sheriffs employed by the State knocked on Jones's apartment door, waking her from sleep. She put on a robe and opened the door slightly. The deputies, who were not dressed in recognizable sheriff's uniforms, identified themselves, and one of them put his foot in the door, to keep it open. The deputies said they were there to serve an arrest warrant on a particular man. Jones responded that the man did not live in her apartment and was not there. The deputies did not have the arrest warrant with them. One of them barged into Jones's apartment through the door and the other broke a large glass picture window of the apartment. Thinking the men were imposters, Jones fought them. They beat her, pulled out part of her hair, and doused her with pepper spray. She tried to get away from them to get help from her neighbors, but because the pepper spray had temporarily blinded her, she could not get far. The deputies arrested her for assaulting police officers and resisting arrest. They retrieved some clothes from her apartment and then forced her to get dressed in the apartment complex parking lot, in full view of the public during daylight hours.

Jones sued the State and the deputies. She alleged negligent training against the State, claiming that it had failed to train the deputies in the legally proper, *i.e.,* constitutional, way to serve or attempt to serve an arrest warrant. She further

alleged that the State negligently supervised the deputies in a way to ensure that they did not commit constitutional violations in serving or attempting to serve arrest warrants. There was no issue of immunity in that case. That is because the State, although cloaked with sovereign immunity, has waived its immunity in tort under the terms of the Maryland Tort Claims Act ("MTCA"), Md.Code (1984, 2009 Repl.Vol.), sections 12–101 *et seq.* of the State Government Article ("SG"). The MTCA explains that "[w]here 'state personnel' are negligent, 'the statute generally waives sovereign or governmental immunity and substitutes the liability of the State for the liability of the state employee committing the tort.' " *Menefee v. State,* 417 Md. 740, 752, 12 A.3d 153 (2011) (quoting *Lee v. Cline,* 384 Md. 245, 262, 863 A.2d 297 (2004)). Under SG section 12–101(a)(6), "[a] sheriff or deputy sheriff of a county or Baltimore City" is a "State personnel." Therefore, the issue of governmental immunity was not raised in *Jones.*

Rather, the issue in *Jones* was whether the State owed any duty to Jones and, if so, whether the evidence at trial was legally sufficient to prove a breach of that duty. In particular, the Court addressed the "public duty doctrine," which "provides that, 'when a statute or common law "imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort." ' " 425 Md. at 20, 38 A.3d 333 (quoting *Muthukumarana v. Montgomery Cnty.,* 370 Md. 447, 486, 805 A.2d 372 (2002), *in turn quoting* Dan B. Dobbs, *The Law of Torts* § 271 (2000)). The Court held that, although the public duty doctrine often had been applied in common law tort cases founded upon the actions or inactions of police officers, it was not applicable in that case:

> [T]he public duty doctrine does not apply if law enforcement is not engaged in protecting the public from an injurious force caused by a member of the public, but rather is itself the alleged injurious force. [Jones's] claim ... alleges harm from the State's negligent training of [the deputies] in what were alleged to be unconstitutional arrest procedures.

The public duty doctrine does not foreclose liability on that claim.

*Id.* at 25–26, 38 A.3d 333. The Court also held that expert testimony was not needed to prove the constitutionally correct way to serve an arrest warrant, as the trial court was presumed to know the law and indeed had properly instructed the jury on the law.

The holding in *Jones* is not relevant to the issue of immunity of a local government against common law tort claims brought against it directly, in its own capacity, for governmental acts or omissions, including allegations of negligent hiring, training, or entrustment.

## II.

### *Grant of Motion for Judgment in Favor of the County for Vicarious Liability for the Torts of Washington: Scope of Employment*

In the trial against the County on the vicarious liability claim against it for the common law torts committed by Washington, the court granted judgment in favor of the County at the conclusion of the appellants' case-in-chief, ruling that the evidence adduced could not support a reasonable finding that Washington was acting within the scope of his employment when he shot Clark and White.

We "review the trial court's grant of [a] motion for judgment *de novo,* considering the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party." *Thomas v. Panco Mgmt. of Md., LLC,* 423 Md. 387, 393, 31 A.3d 583 (2011) (citing Rule 2–519; *C&M Builders, LLC v. Strub,* 420 Md. 268, 290, 22 A.3d 867 (2011); *Scapa Dryer Fabrics, Inc. v. Saville,* 418 Md. 496, 503, 16 A.3d 159 (2011)).

The parties acknowledge that the County only could be found vicariously liable for the common law torts of Washington if his actions were taken within the scope of his employment. The appellants contend the evidence at trial generated

a dispute of material fact as to whether Washington was acting within the scope of his employment when he shot Clark and White, and therefore scope of employment was a jury question. They argue that police officers are trained to react when confronting a threat, and the location of the threat is irrelevant. They maintain that reasonable jurors could have found that Washington was acting within the scope of his employment because he was engaged in the kind of conduct he was employed to perform—protection—right after work, in a place not unreasonably distant from his authorized area of employment, and that his conduct was actuated at least in part to serve the County.

The County responds that the trial court's ruling was legally correct. The evidence adduced by the appellants showed that Washington had taken off from work on the day of the shooting and his motive in shooting Clark and White was not driven by service to the County, whether he was protecting his home or himself. The County was not served by and did not derive any benefit from Washington's actions in shooting Clark and White, even if he did so in the course of a physical fight instigated by the two men.

To determine whether the court's ruling was correct, we must view the evidence adduced on the issue of scope of employment in the light most favorable to the appellants. The evidence was as follows.

The appellants called Washington as a witness in their case. They did not ask him for his version of the shooting (which was not supportive of their theory of the case) but, focusing on the issue of scope of employment, asked him only about his actions after the shooting. For the sake of clarity, we shall recite Washington's testimony on cross-examination first (when he was questioned about the shooting by counsel for the County) and then his testimony on direct and rebuttal (when he was questioned about the aftermath of the shooting by counsel for the appellants).

On cross-examination, Washington stated that when Clark arrived at his front door he told Clark to leave the new bed

rails in the foyer of the house. Clark left the house and went to the truck to get the bed rails, taking about five or ten minutes to do so. When he returned, White was following him. Washington again told Clark to leave the bed rails in the foyer, but Clark said he would take them upstairs. Washington then led the two men upstairs to the master bedroom. Clark placed the box containing the new bed rails on the floor in that bedroom. Washington was in that room with Clark, but White was not. Washington heard a "rustling" sound coming from his daughter's bedroom.

[WASHINGTON]: I asked Mr. Clark, where is your man? Where is the guy with you?

[APPELLEE'S ATTORNEY]: What did Mr. Clark say in response?

\* \* \*

[WASHINGTON]: He said don't worry about it, Shorty, I got him. When he tells me that he backhands me in the chest. He said don't worry about it, Shorty, I got him. I could still hear the noise rustling in my daughter's bedroom.

[APPELLEE'S ATTORNEY]: What did you take it to mean don't worry about it Shorty, I got it?

\* \* \*

[WASHINGTON]: I took it to mean that, you know, don't worry about it. I'm like, look, I'm saying to myself I have two young men in my house and he is telling me in my house don't worry about where the other guy is. That's what I took it.

[COUNTY'S ATTORNEY]: Did there come a time that you found out where Mr. White was?

[WASHINGTON]: Yeah, as soon as I said that to him a second time, where's your man, Mr. White sticks his head out of my daughter's bedroom like this and I see his head sticking out. When I see his head sticking out I said, hey, what are you doing in there? Come out of there.

[COUNTY'S ATTORNEY]: What did you do after you said that?

[WASHINGTON]: He just-he did one of them numbers and sticks his head out. I said, yeah, come out of there.

[COUNTY'S ATTORNEY]: Let me clarify. What did you do next?

[WASHINGTON]: I said, look, man, don't worry about the rails, you'll just leave.

[COUNTY'S ATTORNEY]: Where were you?

[WASHINGTON]: I was still in the master bedroom with Mr. Clark.

[COUNTY'S ATTORNEY]: Did there come a time when you came out of the master bedroom?

[WASHINGTON]: Yes.

[COUNTY'S ATTORNEY]: How soon after you first told him to leave did that happen?

[WASHINGTON]: I think I told him to leave at least three or four times, if not more.

[COUNTY'S ATTORNEY]: My question is how soon after the first time you told him to come out of the master bedroom?

[WASHINGTON]: No more than four or five seconds, six seconds.

[COUNTY'S ATTORNEY]: Once you are out of the master bedroom, what happens next?

[WASHINGTON]: That guy White, he is standing in my daughter's bedroom. He is still right there by the steps in the bedroom. He steps out full body sideways and looks at me. I'm pointing at the steps, I'm saying, look, you get out of my house and just leave, pointing at the steps. I have to walk toward Mr. White because he is in the bedroom by the steps.

[COUNTY'S ATTORNEY]: How was your tone at this point when you are saying get out of my house?

[WASHINGTON]: I said it three or four times. Each time I got a little louder. I said, look, just get out of my house. The first time I guess—they didn't move. He was just looking, the guy there, he is just looking. He didn't say

a word. He is just looking. The other guy is behind me. I'm telling him to get out of my house.

* * *

[WASHINGTON]: He didn't move. Mr. White didn't move. Mr. Clark is walking behind me and he says you need to watch out how you talk to people.

* * *

[WASHINGTON]: Mr. White sucker-punches me in the side of the head. After the guy told me I need to watch how I talk to people, in my own house, he sucker-punches me in the side of the head, and Mr. Clark is standing behind me hits me in the back of the head.

Washington went on to testify that a physical fight broke out and he had to duck down to cover his head while Clark and White both tried to beat him. When asked what he was thinking at that time, Washington responded, "I thought that to myself, you know what, I'm with two big guys and these guys could kill me in my own house." Washington was asked whether and why he had his police issued handgun on his person. He confirmed that he was wearing his handgun, explaining that he was "going out," and that "[w]henever you go out you are supposed to be armed." He also testified that "for 17 and a half years [the entire period he had been a police officer] you become accustomed to however you carry your weapon." He said he was unaware whether Clark or White had a weapon. He also said he was not wearing a police uniform, did not have a police car at his house, and never told Clark or White that he was a police officer.

Washington described the shooting as follows:

I crouched down, I put my hand over my face. Mr. Clark was here to my left. Mr. White was here to my right immediately on top of me.

Mr. Clark starts kicking me because he is punching down, he is a pretty tall guy. He is punching down. I'm a short

guy and I'm ducking down. He is punching me. Then he starts kicking me. . . .

\* \* \*

I was covering up. The guys was [sic] like there, I shot just like that, boom, boom, boom, boom, boom. I jumped up and got out from in between both of them. They fell right where they were.

When asked why he fired his gun, Washington testified: "I did that to save my life, to protect myself from being beat up in my own home, or possibly severely injured or killed, and two strange men in my home with my wife and daughter. I did what any homeowner would do."

Prior to the foregoing, Washington testified on direct examination that after the shooting he called 911 and identified himself as a police officer, telling the operator that there had been a "departmental shooting." He gave his police identification number to the operator and then put on his badge, which until then he had not been wearing. He testified that, in accordance with police procedure, a signal was sent out that an officer needed assistance and that an officer had discharged his weapon. The responding officers confiscated his police issued handgun as part of the procedure for responding to a departmental shooting. According to Washington, he was required to file a "Use of Force Report," which is a report that an officer must fill out "[a]ny time [he] discharge[s][his] firearm." Washington explained he did not give any other statement to the police because he filled out a Use of Force Report.[3]

Washington further testified on direct examination that when he shot Clark and White he was acting in accordance with "General Orders" under which police officers may use force in self-defense or defense of others. Although portions of the "General Orders" were referred to and read from during the testimony of Vernon Herron, the Deputy Chief Administrative Officer for Public Safety and the Director of

---

**3.** The Use of Force Report was not offered into evidence at trial.

Homeland Security, neither the General Orders nor portions of them were offered into evidence.

Herron testified after Washington. Counsel for the appellants asked Herron about the General Orders, and the following colloquy ensued:

[APPELLANTS' ATTORNEY]: Let me show you what has been marked as Plaintiffs Exhibit No—

[DEPUTY CLERK]: Plaintiffs' Exhibit No. 18 is marked for identification.

[APPELLANTS' ATTORNEY]: I will give you a moment to look through Plaintiff's Exhibit No. 18 and then ask you a few questions on that (Handed.)

[HERRON]: Okay.

[APPELLANTS' ATTORNEY]: I will stand over here, sir, to look over your shoulder a little bit and to work with counsel while I question you, okay?

[HERRON]: Okay.

[APPELLANTS' ATTORNEY]: If you would continue to explain to the jury. Am I correct, sir, that the General Orders is a rather voluminous document?

[HERRON]: That's correct.

[APPELLANT'S ATTORNEY]: And the use of lethal force, correct?

[HERRON]: That's correct.

[APPELLANTS' ATTORNEY]: And what I have just handed you as Exhibit Number 18 is a portion of those General Orders?

[HERRON]: That is correct.

[APPELLANTS' ATTORNEY]: That is not a complete set of the General Orders; is that correct?

[HERRON]: No, sir, it's not.

[APPELLANTS' ATTORNEY]: What I have handed you involves things such as the use of force continuum, correct?

[HERRON]: That's correct.

[APPELLANTS' ATTORNEY]: Sir, let me direct your attention to section three, the use of force continuum. Do you see that, sir?

[HERRON]: I do.

[APPELLANTS' ATTORNEY]: Is that the section of the General Orders that sets forth the force to be used by officers in certain circumstances?

[HERRON]: It does.

[APPELLANTS' ATTORNEY]: If you can explain to us upon reviewing that what guidelines the use of force continuum provides to officers under the General Orders?

[HERRON]: The use of force continuum talks about the cooperative or compliant. It talks about whether or not the subject is compliant with verbal commands.

It talks about the passive or nonresponsive, whether or not the subject is uncooperative when taken in custody and fails to respond to verbal commands or directions.

Active resistance is physically evasive movements to get defeat the officer's attempt to control, to include bracing, tensing, pushing, or verbally signaling an intention not to be taken or retained in custody.

It talks about aggression: physical assault or active threat of assault, upon the officer or another.

It talks about life threatening assault: An attack or a threat to attack wherein an officer reasonably believes that the assault will result in serious physical injury or death.

[APPELLANTS' ATTORNEY]: Sir, am I correct that the General Orders are the rules that Prince George's Police are to follow when performing their police duties, correct?

[HERRON]: That's correct.

[APPELLANTS' ATTORNEY]: Am I correct that lethal force is permitted under the General Orders when the officer is acting in defense of himself or others?

[COUNTY'S ATTORNEY]: Objection.

The Court: Overruled.

[HERRON]: That's correct.

[APPELLANTS' ATTORNEY]: Sir, the General Orders also talk about other things, such as how an officer is to dress at certain times, correct?

[HERRON]: It does. It all depends on what assignment that officer has for that particular assignment.

[APPELLANTS' ATTORNEY]: I guess my general point is the General Orders cover almost every aspect of an officer's expected or allowable duties as a police officer?

[HERRON]: Yes, sir, it does.

[APPELLANTS' ATTORNEY]: One moment. That's all I have at this time. Thank you, sir. Other than [sic] I would move in Exhibit 18 subject to discussions with counsel.

[COUNTY'S ATTORNEY]: That is correct, subject to discussions.

THE COURT: Okay. Why don't we just reserve on that then.

The issue of admitting Exhibit No. 18 was never revisited, and, as noted, neither the General Orders nor any portion of them were admitted into evidence.

Ironically, Washington was the only source of testimony that possibly could support the appellants' assertion that he had been acting within the scope of his employment at the time of the shooting. White's testimony about how the shooting took place differed dramatically from Washington's.[4] As

---

**4.** White testified that he and Clark entered Washington's house with the new bed rails in a box and Washington directed them to take it upstairs. Washington went upstairs with the two men and showed them the master bedroom. He (White) and Clark entered the master bedroom and put the box down on the floor. Clark kneeled down to take the bed rails out of the box. Notwithstanding having defective bed rails, the bed in the master bedroom was fully assembled. As Clark kneeled down, he asked Washington, who also was in the master bedroom, why he had not disassembled the bed. Washington responded by telling Clark to "get the fuck out of [my] house." Washington then pushed Clark and said "get the fuck out of my house." The push did not cause Clark to fall over, and he just laughed at Washington. Washington got

the trial judge pointed out in making his ruling, for the jurors to credit the evidence that the appellants argued showed that Washington was acting within the scope of his employment at the time of the shooting, they would have to disbelieve the central theory of the appellants' case, which was that Washington had attacked Clark and White and had done so in self-defense. In any event, the trial court ruled on the issue of scope of employment by assuming, for the sake of argument, that the jury would credit Washington's testimony that he shot Clark and White to protect himself, after they attacked him with their fists.

■ If there is a material factual dispute as to whether an employee's actions were taken within the scope of employment, the question is one of fact. If there is not, the question is one of law. *Rusnack v. Giant Food, Inc.*, 26 Md.App. 250, 265, 337 A.2d 445 (1975). Even when the parties' versions of

---

even more angry and again told Clark to "get the fuck out of his house." White asked Clark, "[D]o you know this guy?" Clark told Washington just to let him do his job and they would be out of the house in just "a couple of minutes."

Washington responded, "no, just get the fuck out of my house," and pushed Clark again, this time causing Clark to fall over on his side. White stepped in and said "we are up out of here. We ain't getting no rails [referring to the defective rails], we leaving." According to White, at that point Clark got up off the floor and started walking backward toward the stairs, but still facing Washington. Washington kept pushing him and White tried to get between the two men because "the situation wasn't getting better," and he just wanted him and Clark to get out of Washington's house. As he tried to get between Washington and Clark, he heard "pop, pop." He recognized the sound as gunshots and knew he had not been hit; but he did not know where the sound had come from because he had not seen a gun. Clark was still walking backwards, toward the stairs. White saw that Clark was about to fall and grabbed him, and then walked down about two stairs. He laid Clark down, as he obviously was injured. White turned around so he was facing Washington, and for the first time saw a gun. Washington was holding it and pointing it at him. White saw Washington's trigger finger moving. He "just couldn't look at him shoot me, so I turned my head right when he pulled the trigger. I had a bullet in this side, he shot me here and he shot me here." After White was shot he laid down in the hallway. When Washington left the hallway, White stood up to try to retrieve Clark's cell phone to call 911. As White was standing, Washington shot him again, this time in the knee.

events are in conflict, however, if the facts adduced to show that the defendant was acting within the scope of his employment are not legally sufficient to support such a reasonable finding by the trier of fact, any dispute of fact is not material, as it will not affect the outcome of the case. *Id.* (citing *Globe Indemnity Co. v. Victill Corp.*, 208 Md. 573, 585, 119 A.2d 423 (1956)) ("Where there is no conflict in the evidence relating to the question [of whether an employee is acting within the scope of employment] and but one inference can be drawn therefrom, the question is one of law for the court."); *Rusnack*, at 266, 337 A.2d 445 (explaining that when a store was sued on the basis of *respondeat superior* for injuries resulting from a fight, although there were conflicting accounts as to the underlying events leading to the fight, "no matter which version of the circumstances leading to the fight is accepted as true, the evidence was not sufficient in law to permit a jury to find that [the employee's] presence in the store and his acts with respect to [the injured party] were in any way actuated by a purpose to serve his master.").

There are many considerations relevant to whether an employee's actions were within the scope of employment. "The general test set forth in numerous Maryland cases for determining if an employee's tortious acts were within the scope of his employment is whether they were in furtherance of the employer's business and were 'authorized' by the employer." *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467 (1991).

The simple test is whether they were acts within the scope of [the employee's] employment; not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By "authorized" is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders.

*Id.* (*quoting Hopkins C. Co. v. Read Drug & C. Co.*, 124 Md. 210, 214, 92 A. 478 (1914), in turn quoting Wood on Master and Servant § 279 (1877)). "[T]here are few, if any absolutes. Nevertheless, various considerations may be pertinent." *Id.* Four such considerations are that

> the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master.

*Id.* (quoting *E. Coast Lines v. M & C.C. of Balto.*, 190 Md. 256, 285, 58 A.2d 290 (1948), in turn quoting *Mechem on Agency*, Section 36; *Huffcut on Agency*, Section 5; *American Law Institute*, RESTATEMENT OF AGENCY, Section 228, comment (b)). In addition, the following considerations should be taken into account:

> [C]ertain conduct of the servant may be within the scope of his employment, although not intended or consciously authorized by the master, but "(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:—(a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of

departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal."

*Sawyer* at 256, 587 A.2d 467 (quoting *Great A. & P. Tea Co. v. Noppenberger*, 171 Md. 378, 390–391, 189 A. 434 (1937), in turn quoting RESTATEMENT OF AGENCY § 229 (1933)) (citations omitted).

The *Sawyer* Court emphasized the importance of foreseeability to the issue of scope of employment. *Id.* at 256, 587 A.2d 467 (citing *Cox v. Prince George's County*, 296 Md. 162, 171, 460 A.2d 1038 (1983)). When an employee's "actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours and at an authorized locality, the employee's actions are outside the scope of his employment." *Id.* at 256–57, 587 A.2d 467 (citing *LePore v. Gulf Oil Corp.*, 237 Md. 591, 596–598, 207 A.2d 451 (1965); *Carroll v. Hillendale Golf Club*, 156 Md. 542, 545–546, 144 A. 693 (1929); *Steinman v. Laundry Co.*, 109 Md. 62, 67, 71 A. 517 (1908); *Central Railway Co. v. Peacock*, 69 Md. 257, 265, 14 A. 709 (1888)).

The *Sawyer* case concerned whether, during an encounter with two men, a State Trooper was acting within the scope of his employment within the meaning of the Maryland Tort Claims Act. Humphries, an off-duty State Trooper, was dressed in plainclothes and driving his personal vehicle on a state road in front of a car Sawyer was driving with a passenger, Hundley. Sawyer and Hundley had no way of knowing that the driver of the car in front of them was a State Trooper. Humphries made some hand motions toward Sawyer and Hundley and then pulled his car over to the side of the road, letting them pass him.

Sawyer drove his car down a side road so he and Hundley could look at a potential construction site that might be a job opportunity. When they got back in their car and drove toward the main road, they saw Humphries's car at the end of the side road, blocking their way, and Humphries standing

outside by the side of his car, motioning for them to approach. As Sawyer slowly drove to the end of the side road, Humphries picked up a rock and threw is at the side of Sawyer's car, denting it. Sawyer stopped the car and got out to talk to Humphries about the damage. Humphries picked up more rocks and threw them at Sawyer's car. Sawyer picked up a beer bottle from the side of the road, to defend himself. Humphries attacked Sawyer, beating him and threatening to kill him. Hundley exited the car to help Sawyer, but retreated when Humphries threatened him. Sawyer managed to get away from Humphries, and he and Hundley drove off, with Hundley at the wheel because Sawyer was too badly injured to drive.

Humphries followed the two men. When they stopped at a stop sign, he got out of his vehicle, walked to where Sawyer was sitting at the passenger side of his vehicle, announced that he was a State Trooper, and said he was placing Sawyer under arrest. Sawyer and Hundley did not believe Humphries, and Sawyer resisted. Eventually, marked police vehicles arrived and Sawyer was arrested. It is not clear what they were trying to arrest Sawyer for, or what charges ever were placed, if any.

Sawyer and Hundley sued Humphries for assault and battery. Humphries moved to dismiss on the ground that he had immunity under the MTCA because, at the time of the alleged incidents, he was a State Trooper and was acting within the scope of his employment and without malice. The circuit court granted the motion. On appeal, this Court affirmed, holding that because as a sworn police officer Humphries was on duty at all times (24 hours a day, seven days a week, 52 weeks a year), he always was acting within the scope of his employment, and therefore was doing so at the time of the alleged incidents; and there was no legally adequate allegation of malice.

The Court of Appeals granted *certiorari* and affirmed in part and reversed in part. The Court held that the same basic principles and considerations generally applicable to

determining whether an employee was acting within the scope of his employment apply to police officers, but that specific principles pertinent to police officers apply as well. *Id.* at 258, 587 A.2d 467. It rejected this Court's holding that because police officers are on duty 24 hours a day, seven days a week, 52 weeks a year, they always are acting within the scope of their employment. The Court explained:

> We agree with the Court of Special Appeals that a police officer may be "on duty" 24 hours a day in the sense that he may be on call and may under the circumstances have an obligation to act in a law enforcement capacity even when on his own time. That does not, however, lead to the conclusion that the officer is always acting in furtherance of the State's business of law enforcement and that all conduct is incidental to police work. Even though a police officer may be said to be "on duty" all of the time, cases regularly hold that a police officer acts outside the scope of his employment where he acts for his own personal reasons and not in furtherance of his employer's law enforcement function.

322 Md. at 258–259, 587 A.2d 467 (footnote omitted).

The Court in *Sawyer* concluded, upon application of the relevant considerations for determining scope of employment to the allegations in the complaint, that some of Humphries's actions had not been performed within the scope of his employment, as a matter of law, while others were not either clearly outside or within the scope of his employment. The Court found that when Humphries threw rocks at Sawyer's car, attacked Sawyer and beat him up, and threatened to physically attack Hundley, he was acting outside the scope of his employment as a State Trooper, as a matter of law. Explaining, however, that "[o]rdinarily when stopping a motorist or making or attempting to make an arrest, a police officer is acting within the scope of his employment," the Court held that it could not be said as a matter of law that Humphries was acting outside the scope of his employment when he approached the car occupied by Sawyer and Hundley at the stop sign and attempted to arrest Sawyer. *Id.* at 260–61, 587 A.2d 467.

The Court commented, moreover, that the counterallega-
tions of fact set forth by Humphries in his opposition to the
motion to dismiss with respect to the stone-throwing encoun-
ter, even if accepted as true (which is not consistent with the
standard of review), would lead to the conclusion that Hum-
phries was not acting within the scope of his employment, as a
matter of law. The Court stated:

Even under the version of facts set forth by the defendant
Humphries in the memorandum supporting his motion to
dismiss, when Humphries threw the rock at the plaintiffs'
car and struggled with the plaintiff Sawyer along Route 31,
Humphries was not attempting to detain or arrest either
plaintiff but was acting in self defense. It was not until the
plaintiffs drove off and Humphries got in his car and began
to pursue the plaintiffs that he claims that he intended to
arrest them for an offense. *See Rusnack v. Giant Food,
Inc.*, 26 Md.App. 250, 266, 337 A.2d 445, 454 (1975) ("Wheth-
er [the employee] was then bumped inadvertently by [the
plaintiff] and immediately assaulted and beat [the plaintiff],
as [the plaintiff] said, or whether [the employee] upon being
purposely bumped and struck by [the plaintiff], acted in
self-defense, as [the employee] indicated, the result is the
same. No matter which version is accepted as correct, it
cannot be fairly said that [the employee] was advancing [the
employer's] interests in doing what he did. . . .").

322 Md. at 257–58 n. 6, 587 A.2d 467.

As noted in the case at bar, the appellants argue that the
facts adduced at trial and the reasonable inferences that could
be drawn from those facts made the question whether Wash-
ington was acting within scope of his employment when he
shot Clark and White a jury issue. They emphasize that, at
the time of the shooting, Washington was a police officer for
Prince George's County and was required to carry a weapon
when in Prince George's County; that in calling 911 after the
shooting, he identified himself as a police officer; that he told
the 911 operator that the shooting he was reporting was a
"departmental shooting"; that after the shooting, he donned
his badge; that, in accordance with police procedure, a call

was sent out that an officer was in need of assistance and that an officer had discharged his weapon; and that a Use of Force report was filed, also in accordance with police procedures.

They further emphasize that Washington testified that when he shot Clark and White he was acting in accordance with his police training in responding to a threat, and in particular in accordance with General Orders that provide that police officers may have to use force in defense of themselves or others. Turning to the *Sawyer* factors, the appellants argue that confronting a perceived threat is precisely the kind of police activity Washington was employed to perform. Moreover, the fact that police officers may have to take action when they are off duty demonstrates that Washington's actions were not unreasonably disconnected from his authorized period of employment. The appellants point out that Washington was in Prince George's County when he shot Clark and White and if, as he testified, he was attempting to contain a threat, he was acting to serve the master, *i.e.*, Prince George's County. Finally, the appellants argue that it was foreseeable that Washington would engage in such action because he had a history of mental illness and violence.

We disagree that the evidence adduced at trial generated a material factual dispute over whether Washington was acting within the scope of his employment as a Prince George's County police officer when he shot Clark and White in his own house. As explained above, when an employee's actions are "personal, or when they represent a departure from the purpose of furthering the employer's business, or when the employee is acting to protect his own interests," the actions are outside the scope of employment. Therefore, whether or not Washington was acting to protect his home and family or was acting unprovoked, he was acting outside the scope of his employment. In testifying that Clark and White started to beat him up, Washington acknowledged that he shot them to protect himself, just as any homeowner with a gun would do.

The evidence was undisputed that Washington had taken the entire day off work to be home for the furniture delivery.

He was clearly off-duty and, as his own testimony established, he was not required to carry his service revolver on his person while off duty in his house. Indeed, Washington was not supposed to be wearing his service weapon holstered; he attempted to explain that oddity away by saying that he was planning on leaving the house right after the bed rails were delivered. Shooting people in one's home is not the same type of conduct that police are authorized by the County to engage in. Nor is shooting delivery people in one's home "commonly done" by police officers. Moreover, although still a sworn police officer, Washington had for several years been assigned to a desk job at the County Department of Homeland Security in which he did not patrol the streets, carry out arrests, confront people engaged in dangerous or criminal activities, serve warrants, or the like.

Finally, and perhaps most importantly, whether Washington's account of events or White's account of events is believed, Washington's motive in this case clearly was not to "serve the master." Washington testified that he shot White and Clark "to save [his] life, to protect [himself] from being beat up in my own home, or possibly severely injured or killed," just as "any homeowner would do." On the facts viewed in the light most favorable to the appellants on the scope of employment issue, Washington did not act out of a motive to protect the public. His own testimony showed that he became angry at the delivery men when he thought White had entered his daughter's bedroom and Clark called him "Shorty," and a fistfight ensued, on the second floor of the house, in a bedroom, not near any other people (there was no evidence that members of Washington's family ever were in danger) and not outside in any public setting. There was no indication that Clark or White were armed or that they would be a danger to anyone in the public.

Washington's actions after the shooting—calling 911, identifying himself as a police officer, putting on his police badge, and filing reports—do not show that he was acting within the scope of his duties as a police officer when he shot the two delivery men in his house. As is undisputed, Washington did

not identify himself to Clark and White as a police officer while the fracas he claims happened was going on. If during the fracas, Washington had been acting as a police officer, to protect the peace and the safety of the public, he would have identified himself as an officer either immediately before or when the fight broke out, to gain control of the situation. Clark and White had not broken into Washington's house; on the contrary, they had been invited in for specific, legitimate purposes. Washington knew they had come to deliver the replacement bed rails, opened his door to them, and led them upstairs to the master bedroom. He then shot them when they started beating him with their fists, as he put it, like any homeowner with a gun would have done. Washington only engaged in conduct that was consistent with police duties (putting on his badge, etc.) *after* the shooting was over, when doing so no longer mattered in resolving any dangerous situation and when doing so could serve the future purpose of creating the impression that he was acting as a police officer.

Finally, as we shall explain in detail in addressing Question IV. below, Washington's previous mental health history and other off duty actions did not make it reasonably foreseeable to anyone on the Prince George's County Police force that he would shoot two apparently unarmed delivery men in his own home. The trial court properly granted the motion for judgment in favor of the County on the vicarious liability claims against it stemming from Washington's alleged common law torts because the evidence did not generate a factual dispute on the scope of employment issue.[5]

---

5. As mentioned above, the appellants would seem to have been in a Catch 22 situation on the scope of employment issue in any event. Because the common law torts directly against the County were properly dismissed based on governmental immunity, the only common law tort claim remaining against the County was based on alleged vicarious liability for the torts of Washington. If jurors were to fully credit Washington's version of events, that he shot Clark and White because they attacked him and only out of self-defense, they would not find that Washington had committed any torts, and there would be no tort for which the County would be vicariously liable. If jurors were to fully credit White's version of events, which was that Washington was the

### III.

### Denial of Motion for Partial Summary Judgment on Constitutional Tort Claim Based on Collateral Estoppel

■■■ After the shootings, Washington was charged criminally and was convicted by a Prince George's County jury of one count of voluntary manslaughter, two counts of first-degree assault, and two counts of use of a handgun in the commission of a felony or crime of violence. He was sentenced to a total of 45 years' imprisonment. On appeal, this Court affirmed the judgments. *Washington v. State*, 191 Md.App. 48, 990 A.2d 549, *cert. denied*, 415 Md. 43, 997 A.2d 792 (2010).

In the case at bar, the appellants moved for partial summary judgment on the constitutional tort claim against the County on the ground of collateral estoppel. They argued that the criminal convictions against Washington operated to bar the County from denying that Washington had assaulted Clark and White and from taking the position that Washington had acted in self-defense when he shot them. They asked the court to enter an order "holding that Mr. Washington did assault the Plaintiffs when he shot them." They maintained that, once the court did so, that would "leave[ ] the issue of whether or not the actions or omissions of the County violated the constitutional rights of the Plaintiffs." The court denied the motion.

The appellants contend the court's ruling denying their motion for partial summary judgment was in error, in that the doctrine of collateral estoppel compelled the opposite result.

---

aggressor against him and Clark and shot them in a fit of rage as they were trying to leave Washington's house to get out away from him, they would find that Washington assaulted and battered White and Clark but, for reasons above and beyond what we already have explained, Washington was not acting within the scope of his employment when he shot the two. Nevertheless, we have addressed why the facts adduced did not generate a jury question on scope of employment, even crediting in full Washington's non-tortious rendition of the events that happened on the evening in question.

The County responds that the doctrine of collateral estoppel did not apply at all, and the court correctly denied the motion.

 "It is a well-settled rule in Maryland that a criminal conviction is inadmissible to establish the truth of the facts upon which it is rendered in a civil action for damages arising from the offense for which the person is convicted." *Aetna Casualty & Surety Co. v. Kuhl,* 296 Md. 446, 450, 463 A.2d 822 (1983) (citing *Eisenhower v. Balto. Transit Co.,* 190 Md. 528, 59 A.2d 313 (1948); *Galusca v. Dodd,* 189 Md. 666, 57 A.2d 313 (1948); *Insurance Corp. v. Sherby,* 165 Md. 1, 165 A. 809 (1933); *Pugaczewska v. Maszko,* 163 Md. 355, 163 A. 205 (1932); *Balto. & Ohio R. Co. v. Strube,* 111 Md. 119, 73 A. 697 (1909)).

 Moreover, the doctrine of collateral estoppel, or issue preclusion, which the appellants sought to use to circumvent the well-established law just mentioned, only will apply when an issue decided in a prior adjudication was identical to the issue to be decided in the present action; there was a final judgment on the merits in the prior adjudication; the party against whom the doctrine is asserted was a party to the prior adjudication or was in privity with a party to the prior adjudication; and the party against whom the doctrine is asserted had a fair opportunity to be heard on the issue in the prior adjudication. *Burruss v. Bd. of Cnty. Comm'rs,* 427 Md. 231, 249–50 (2012).

In denying the motion for partial summary judgment, the trial judge stated what is clear—the County was not a party to the criminal case brought by the State against Washington. The judge ruled that, not having been a party to the criminal case, the County, "[d]idn't have an opportunity to be heard on the issue. Wasn't really in privity with the parties to that action. . . . So I don't think you can use a criminal conviction as collateral estoppel in a subsequent civil proceeding." This ruling was correct. For all these reasons, the circuit court properly denied the appellants' motion for partial summary judgment in their favor on their constitutional tort claim against the County.

## IV.

### *Exclusion of Evidence About Washington's Mental Health History and Alleged Prior Violent Acts*

 In their constitutional tort claim, the appellants alleged that the County violated their rights under articles 2, 19, 24 and 26 of the Maryland Declaration of Rights by acting with deliberate indifference to the safety of Clark and White as members of the general public. The essence of the claim was that, knowing Washington's history of mental health problems and of engaging in violent acts, the County, by its Police Department, should not have allowed him to continue as a member of the police force in any capacity in which he would be allowed to have a service revolver. The appellants maintain that, given Washington's past history, it was reasonably foreseeable that Washington would commit violent acts against members of the public who were in his house by permission, such as Clark and White. By allowing Washington to remain on the police force in a capacity in which he could carry a service revolver, the County endangered the safety of Clark and White and of all members of the public who would come into contact with him.

As explained, before the bifurcated trial on the constitutional tort claim, the County moved *in limine* to exclude the evidence of Washington's mental health history and of certain alleged prior violent acts he had committed. The court granted the motion. On appeal, the appellants contend the trial court's *in limine* ruling was legally incorrect; and if the trial court had properly allowed the challenged evidence to be introduced, the constitutional claim would have gone to a jury for decision instead of being disposed of by summary judgment in favor of the County. They argue that a *de novo* standard of review should apply, as it does with all appeals from orders granting summary judgment.

The County responds that the trial court correctly granted the motion *in limine* on the ground of relevancy, and, like all such rulings, this one should be reviewed for abuse of discretion.

The evidence that the court excluded in granting the motion *in limine* consists of 21 exhibits (all attached to that motion) containing the following evidence.

Washington was first evaluated for psychiatric issues on December 18, 1995, by Daniel J. Freedenburg, M.D., during a fitness-for-duty review that was requested by the Medical Advisory Board of Prince George's County. Dr. Freedenburg noted that Washington was referred for evaluation after a "series of occurrences on the job." At the time, Washington was a patrol officer. Under the "History" section, the doctor wrote:

> On November 15, 1995, Mr. Washington reported to [a sergeant] that he was unable to handle the stress on the job. He had previously contacted [a superior] regarding the possibilities of obtaining a noncontact position. Cpl. Washington told [the sergeant] that he was unable to deal with the citizens and was uncertain how he may react to them. He was concerned about pending lawsuits and that he was scheduled to meet with [ ] the police department psychologist. During this interchange, Cpl. Washington began to cry.
>
> \* \* \*
>
> There were some recent complaints about Cpl. Washington's behavior from citizens. On November 8, 1995, Cpl. Washington responded to a call from a[man]. [The man] stated that someone had stolen items out of his car. When he approached Cpl. Washington, the officer did not get out of the cruiser. [The man] could not locate the registration card requested by Cpl. Washington and had to go to get his driver's license. When he returned he noticed that Cpl. Washington was holding a weapon in his hand. [The man] inquired why the gun was in his hand, and the officer responded that [the man] was not to worry, that the gun was for Cpl. Washington's safety. [The man] was uncomfortable by the officer's display of his weapon. Cpl. Washington told the citizen that he felt threatened, and he was

not going to put the gun away. [The man] advised Cpl. Washington to leave the property.

\* \* \*

There was a prior complaint on October 9, 1995, made by [a woman] in which she complained that Cpl. Washington had used excessive force including a night stick while making an arrest. There have been similar complaints against Cpl. Washington at that location in the past.

\* \* \*

[Another Cpl.] had heard Mr. Washington joking that he was going to retire on the 70% disability if he could get it. He also told an officer not to back him up on a 7A call because he did not want witnesses. Cpl. Washington also stated to [the sergeant referred to previously] that he was not going to lose his life attempting to lock up a drug dealer.

The evaluation goes on to describe Washington's fear of being on the police force, his diagnosis of depression, battle fatigue, and stress burnout, and his aggression toward others as a result of his stress.

Dr. Freedenburg recommended that Washington be placed on "light duty" for two months, during which time he should seek therapy. Dr. Freedenburg said that after two months Washington again should be evaluated. Dr. Freedenburg concluded that Washington was "a potential danger because of his impulsivity and generalized fearfulness."

On August 5, 1996, Bruce Smoller, M.D. conducted a psychiatric evaluation of Washington. Dr. Smoller noted that Washington either wished to be returned to full time status or to retire. Dr. Smoller described the incidents leading to Dr. Freedenburg's recommendation that Washington be placed on light duty. Dr. Smoller explained that Washington had been "investigated several times by internal affairs for excessive use of force, but each complaint resulted in an exoneration." He also noted that there were "two civil cases still pending against [Washington,] one for false arrest and one for excessive use of force." Dr. Smoller documented that Washington

had been in sporadic therapy since his placement on light duty status. Dr. Smoller found that Washington had work-related depression and that "his disability is partial and temporary."

Dr. Smoller recommended that Washington undergo two months of intensive therapy with medication to see if his ambivalence and resentment toward the police force could resolve. In an addendum to his report, on August 7, 1996, Dr. Smoller wrote that he had been advised that Washington would not comply with the therapy recommendation, and that in his opinion, Washington "is not disabled from full time police work because of any medical condition related to police work or incidents arising out of police work" but that he was "ambivalent to the point of concern for safety."

On November 21, 1996, Washington was evaluated by another psychiatrist, Joseph Marnell, M.D., at the request of Washington's own attorney to determine whether his emotional condition was permanent. Dr. Marnell determined that Washington should continue therapy, and meet with superiors to discuss on-the-job problems. Dr. Marnell also concluded that Washington did not need medication at the time.

It is undisputed that Washington returned to full time police duty in February 1997. Attached to the County's motion *in limine* are documents from a civil suit filed on May 26, 1998, in the United States District Court for the District of Maryland, against a number of defendants, including Washington. Two plaintiffs alleged false arrest, malicious prosecution, and battery. The incident underlying the suit occurred when Washington responded to a car accident. He conducted a patdown search of one of the plaintiffs, a man involved in the car accident, and arrested the other plaintiff for hindering when he interfered with his (Washington's) efforts to perform the pat down. The case was tried to a jury, which returned a verdict in favor of the plaintiffs against the defendants. As to Washington, the court granted a judgment notwithstanding the verdict on the basis of legally insufficient evidence as to the plaintiff who was arrested for hindering, but noted that there was legally sufficient evidence to support the jury's

finding that Washington committed a battery against the man involved in the car accident when he patted the man down.

The next items of evidence the court excluded concerned incidents that were alleged to have occurred several years later, in January and February 2004, at meetings of the "Simmons Acres Neighborhood Watch," a neighborhood group for the community in which Washington lived. The incidents were not job related. On January 12, 2004, at a meeting of the neighborhood group, Washington became involved in a dispute with another man, who then filed a police report about it. The man reported that he and Washington had had words, and that Washington had asked the man to go outside to settle the matter. According to the report, when they went outside, Washington

> proceeded to take his jacket off and his cell phone and then proceeded to become verbally abusive in his language (swearing) and making more accusations about me. I left my jacket, hat, glasses and cell phone on my person and engaged him in his tirade at which time he then hauled off and shoved me with both his hands, and balled up his fists at his side as if ready to fight. I immediately put my hands behind my back and continued the heated conversation, after a few minutes two gentlemen heard our heated conversation and came to the back of the Fire Hall and Mr. Washington and I went our separate ways.

Two days later, a woman complained that Washington confronted her right after a "board meeting" of the same group, saying he was going to "fire [her] up at the February 2nd meeting." She took that as a threat and found it frightening. Then, on January 28, 2004, at another such meeting, Washington was confronted about his conduct at the January 14, 2004 meeting, and responded by shouting and cursing.

The man who reported the January 28, 2004 incident stated that Washington told him to "step outside and [Washington] would 'kick [his] ass.' " When the man started to walk away, Washington followed him, "shouting things at [him] like, 'I'm going to kick your ass[,'] 'I'm going to stomp your ass[,' and]

'come here so I can fuck you and make you my bitch.'" The man reported:

> When others asked [Washington] to calm down, he began cursing again at them. With the conviction in his eyes and the rage in his voice [and] words, I was very fearful for myself and the others he was verbally abusing. From what I was told that he had done this twice in the pas[t] couple of weeks with two of the other people that witnessed this incident. I then asked [a witness] for her cell phone to call the police. Only at that time did he start to go back to his car and leave, still cursing everyone.

The Prince George's County Police Department performed a full investigation of these incidents. The written investigation report also was attached as an exhibit to the County's motion *in limine.*

The appellants argue that the circuit court erred in granting the County's motion *in limine* to exclude the foregoing evidence. They maintain that the County was on notice of Washington's mental state, yet took no follow up action when they returned Washington to active duty. The County did not follow up with Washington's therapy despite returning him to active duty after being told that Washington needed to remain in therapy. The appellants argue that the County took no action to take away Washington's gun when Washington was accused of assaulting the two men at the scene of the car accident. They argue further that between the time that Washington returned to active duty in 1996 and the shooting of Clark and White in 2007, the County took no steps to ensure that Washington was undergoing psychiatric examinations or treatment. The appellants maintain that the fact that there were no documented psychiatric examinations of Washington after 1996 was itself sufficient evidence to prove deliberate indifference on the part of the County.

The County responds that the court properly ruled on the issue of relevancy. First, the evidence of Washington's mental health history from ten years before the shooting in this case is too attenuated in time to prove that it was reasonably

foreseeable to the County (*i.e.*, the Prince George's County Police Department) that ten years thereafter Washington would shoot two people, in his own house, as they were delivering furniture. The County further argues that none of the other incidents—Washington's arrest of the man at the scene of the car accident and his angry and confrontational behavior at the community meetings—was sufficient to put the County on notice that years later Washington would shoot two delivery men while they were working inside house. Finally, the County maintains that Md.Code (2003, 2011 Repl.Vol.), section 3–110(a)(1), (b) of the Public. Safety Article ("PS") makes evidence of a formal complaint against a law enforcement officer inadmissible if the action was dismissed by a hearing board, or the complaints were found to be baseless. Although the Prince George's County Police Department conducted an investigation into the complaints regarding Washington's conduct at the "board meetings," whatever charges ever resulted were determined to be "non-sustained," and therefore were inadmissible.

In granting the motion *in limine,* the judge stated, with respect to the evidence of Washington's prior mental health history and prior actions in the course of his job as a patrol officer:

> [T]he plaintiff has to show that the County was-breached the duty deliberately and indifferent[ly] ... as a result of that, the conduct in January of 2007 was highly likely to occur.
>
> And, again, it seems to me given the passage of ten years for almost all of these incidents, and prior acts and transactions, it's too attenuated. It's not highly likely to occur if ten years passed without it happening.

Thus, the court ruled that the evidence in question was not relevant because of the long period of time between the actions the evidence concerned and the shooting in this case. With respect to the incidents at the homeowners' association meeting in 2004, the court stated, "even in the light most favorable to the plaintiff, you don't make it highly likely [from

what happened at the HOA meetings] that three years later Mr. Washington would shoot somebody. Or two people."

 Maryland counties and municipalities are not immune from liability for state constitutional torts. *DiPino,* 354 Md. at 51–53, 729 A.2d 354. "Maryland's constitution impose[s] an affirmative obligation to avoid constitutional violations by its employees through 'adequate training and supervision' and by 'discharging or disciplining negligent or incompetent employees.' " *Prince George's County v. Longtin,* 419 Md. 450, 495, 19 A.3d 859 (2011).

 A trial court's ruling on the admission of evidence on the basis of relevancy is reviewed for abuse of discretion. *See Owens v. State,* 161 Md.App. 91, 111, 867 A.2d 334 (2005) (citing *Tuer v. McDonald,* 112 Md.App. 121, 136, 684 A.2d 478 (1996), *aff'd,* 347 Md. 507, 701 A.2d 1101 (1997)); *see also Parker v. State,* 185 Md.App. 399, 439, 970 A.2d 968 (2009) (citing *Best v. State,* 79 Md.App. 241, 259, 556 A.2d 701, *cert. denied,* 317 Md. 70, 562 A.2d 718 (1989)) ("A ruling on relevance is 'quintessentially' within the discretion of the trial judge.").

In *Parker v. State,* 185 Md.App. 399, 970 A.2d 968 (2009), this Court also dealt with the exclusion of evidence based on relevance and attenuation. There the defendant was convicted of assault after he threatened a neighbor with a gun in retaliation against her for calling the police on him. About six months before the threat, the defendant had rescued the neighbor's children from a fire in her home. Apparently, the fact of the fire eventually led to the neighbor losing custody of her children, and she blamed the defendant for that. Before trial, the State moved *in limine* to preclude the defense from eliciting evidence of the fire and all it entailed. The defense wanted to use the evidence to argue that the neighbor hated the defendant and therefore was lying in her testimony about him. The trial court ruled that the evidence of the fire was not relevant and was too attenuated to prove that the neighbor was lying. In upholding the trial court's ruling, we stated "the court was entitled to conclude that the relevance of the fire

was simply too attenuated, and that establishing a foundation for the evidence would have required inquiry into tangential matters." 185 Md.App. at 427, 970 A.2d 968.

In the same way, in this case, the trial court did not abuse its discretion in excluding evidence of Washington's prior conduct. The trial court explained its finding that the ten year gap between the psychiatric evaluations and the shooting of Clark and White made the evidence too attenuated to be probative. The trial court also explained that the evidence of Washington's acts at the homeowners' association meetings were not of a nature that would put the County on notice that Washington would, years later, shoot men in his own home.

The abuse of discretion standard of review recognizes wide discretion in the trial court to rule on the admissibility of evidence, when not strictly a legal issue, that only will be overturned when the trial judge has acted well beyond the bounds of what is reasonable in his or her decision-making. Here, the trial court's rulings that attenuation in time and difference in nature between the evidence of Washington's long past psychiatric troubles—which mainly related to job anxiety—and his hot-headedness during neighborhood association meetings reduced any predictive value of that evidence to the point that it was not probative were within the bounds of discretion. The trial court did not abuse its discretion in excluding the evidence.

The parties agree that, assuming the circuit court correctly denied the appellant's motion for partial judgment on the constitutional tort claim, which it did, for the reasons discussed in Question III, once the trial court granted the motion *in limine*, the appellants did not have evidence to present to send the constitutional tort claim to a jury for decision. Accordingly, summary judgment properly was granted in favor of the County on that claim.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**